COLEMAN, ATTY. GEN., et al., FOR USE, ETC. *v.* SHIPP, et al.

No. 39446 March 21, 1955 78 So. 2d 778

518

Murray L. *Williams*, Water Valley, for appellants.

*Fred B. Smith,* Ripley; *Smallwood, Sumners & Hickman,* Oxford, for appellees.

McGEHEE, C. J.

A suit involving the matters hereinafter mentioned was originally filed by Armis E. Hawkins, District Attorney, covering about ninety alleged private projects some of which were constructed and the remainder maintained at the expense of Supervisors' District No. 4 of Lafayette County, from which district the appellee C. B. Shipp was elected as a member of the board of supervisors of said county in 1943 and began his term of office on the first Monday in January 1944, and in which capacity he has served continuously since that time, with the appellee United States Fidelity & Guaranty Company as surety on his official bond.

Thereafter the present suit was filed in the names of both Armis E. Hawkins, District Attorney, and J. P. Coleman, Attorney General of Mississippi, under a different chancery court docket number, for and on behalf of the taxpayers of the said Supervisors' District No. 4, and in which suit the number of the alleged private projects complained of was reduced to about sixty, by reason of the fact that such of the projects as required less than one day for construction or in work in connection with the maintenance thereof, were eliminated.

The instant suit asked for a discovery under oath by the defendant supervisor and the surety on his official bond as to the amount of the cost to the road fund of the said supervisors' district of each of the projects complained of. An amended answer of the defendants to the bill of complaint set forth the amount of the cost of each project as determined by a conference between the supervisor and the road hands of the said district, including the value of the use of the road machinery and equipment, the hours of labor employed, and the cost of

the gasoline and oil used in connection with such projects as the supervisor admitted were maintained by him with the road machinery, equipment, labor and supplies. This discovery covered forty-two alleged private roads complained of in the bill of complaint, and claimed that the same were public roads, but did not cover the cost to the district of the other eighteen projects consisting of pools and ponds on the lands of private individuals, and for the reason that the answer of the defendant supervisor and his surety expressly denied that any of the pools and ponds complained of were constructed with his knowledge or consent.

As to such of the eighteen private pools and ponds that were shown to have been constructed with the tractors, graders, bulldozers, and other equipment of the district, the proof discloses, without dispute, that it was the custom for this heavy road equipment to be left on the roadside, or at or near some local residence, from about five o'clock in the afternoon until the road hands returned the next morning, and also over the weekend, and that those private citizens who used the same for the purpose of constructing or cleaning out a pool or pond on their land would do so by arranging with some private individual, who knew how to operate such machinery, to do the work between five o'clock in the afternoon and the time for the return of the road hands on the next morning, and without the knowledge or consent of the defendant supervisor.

 This officer testified that in one or two instances where he learned about the machinery having been so used for private purposes, he complained to the landowner in regard thereto and stated in substance that he could not permit the road machinery of the district to be used for such a purpose. His testimony in this regard was undisputed, and the trial judge therefore held that the road machinery and equipment, and the gas and oil paid for by the district, were used without the knowledge or consent of the defendant supervisor, and that he was

not liable for the value of the use thereof. We are of the opinion that we would not be justified in reversing the decree of the chancellor in that regard. Hence we eliminate those alleged eighteen private pools and ponds from the complaint, and go to the consideration of the 42 alleged private roads which are claimed to have been maintained by the defendant supervisor with the use of the road machinery, equipment, gas and oil, and through the labor of the employees of the district, all of which projects are claimed by the defendants to have been public roads under the circumstances hereinafter mentioned.

Section 170 of the State Constitution of 1890 provides, among other things, that "Each county shall be divided into five districts, a resident freeholder of each district shall be selected, in the manner prescribed by law, and the five so chosen shall constitute the board of supervisors of the county, a majority of whom may transact business. The board of supervisors shall have full jurisdiction over roads, ferries, and bridges, to be exercised in accordance with such regulations as the Legislature may prescribe, and perform such other duties as may be required by law; * * * ."

Section 2890, Code of 1942, reads in part as follows: "The boards of supervisors shall have within their respective counties full jurisdiction over roads, ferries, and bridges, except as otherwise provided by Section 170 of the Constitution and all other matters of county police. * * * ."

It will be noted that Section 170 of the Constitution, supra, requires that the jurisdiction of the boards of supervisors over roads, ferries, and bridges is "to be exercised in accordance with such regulations as the Legislature may prescribe, * * * "; and that Section 2890, Code of 1942, gives the board of supervisors jurisdiction over roads, ferries, and bridges, "except as otherwise provided by Section 170 of the Constitution * * * ."

From time immemorial it has been considered that the jurisdiction of the board of supervisors over roads has reference to *public* roads which have been established either by dedication, prescription, or under the method provided by statute.

Section 8314, Code of 1942, embodying the regulations prescribed by the Legislature, finds its origin in Chapter 10, Art. 9 (1), Hutchinson's Code 1848; Chapter 15, Art. 1, Code of 1857; Section 2336, Code of 1871; Section 823, Code of 1880; Section 3892, Code of 1892; Section 4400, Code of 1906; Section 7080, Hemingway's Code of 1917; Section 6340, Code of 1930; and Chapter 226, Laws of 1926. This statute reads in part as follows: "When any person shall desire to have a public road other than a road being maintained by the state highway department laid out, altered or changed, a petition shall be presented to the board of supervisors of the county, signed by ten or more freeholders or householders of the county interested in the road, setting forth the commencement and termination and general course thereof, and that the public interest or convenience requires the road to be laid out and opened or altered or changed, as shown in the petition; * * * and thereupon the board of supervisors shall hear the parties, and if it determine that the prayer of the petitioners ought to be granted, in whole or in part, it shall appoint a committee of two members, of districts other than that of the road or proposed road, which shall examine and view the contemplated route of the road, and, if they find the same practicable, they shall lay out and mark the road, or the alteration or change, and report their proceedings in writing to the board at its next meeting."

Section 8286, Code of 1942, provides in part as follows: "All roads now laid out and opened or hereafter laid out and opened *according to law* shall be deemed public roads and highways and shall be opened and worked at least sixteen feet wide, wherever practicable,

and in any case not less than twelve feet, and any greater width that may be necessary. * * * '' (Italics ours.)

After a careful reading of the testimony and a subsequent review thereof, we have concluded that there is no substantial conflict in the testimony that at least 18 of the 42 road projects were in truth and in fact private roads and driveways in which neither the general public nor a number of other freeholders or householders were interested in the sense necessary to constitute them public roads; that these 18 projects were either half circle driveways leading from the public road by the residence of a private citizen and then back into the public road or were roads merely leading from the nearby public road down to the residence in front of which the same made a circle and led back over the said route to the public road. Without classifying the same as to the above two designations, we now give the names of each of these projects and the cost to the supervisors' district of their maintenance by the defendant supervisor, during either the year 1950, 1951 or 1952, according to the testimony of said defendant, but entirely during the year 1951 according to the allegations of the bill of complaint. We give the cost of each of these projects as taken from the discovery under oath on January 3, 1953, by the defendant supervisor in his amended and supplemental answer to the bill of complaint filed herein in the name of the district attorney and attorney general. These were all constructed and maintained by the predecessor in office of the defendant supervisor for a long period of time and thereafter maintained by the latter, and consisted of the Stanley Browning road, costing the supervisors' district $10.43; the L. A. Jones road, costing the district $20.20; the Hubert Jones road, costing the district $4.75; the Henry Gray road, costing the district $26.95; the D. W. Varner road, costing the district $41.65; the Tom Browning road, costing the district $16.00; the S. A. Littleton road, costing the district $6.95; the Leroy Turpin road, costing the district $7.35; the

Ralph Waller road, costing the district $17.70; the Robert Redding road, costing the district $35.40; the Marvin Pierce road, costing the district $27.55; the Bill Evans road, costing the district $14.35; the Cleveland McElroy road, costing the district $12.45; the Doyle Smith road, costing the district $9.15; the Floyd Bumgardner road, costing the district $13.65; the Noel Horn road, costing the district $7.00; the R. M. Brown road, costing the district $.55; and the Paul Coleman road, costing the district $23.75; totaling the sum of $295.83; which we adopt as being the correct amount for these 18 projects according to the discovery under oath by the defendant supervisor, in the absence of sufficient proof by the complainants that these projects cost the district the larger sums alleged in the bill of complaint or more than the cost admitted by the defendants.

The defendant supervisor testified as to the number of loads of gravel hauled and placed on each of these projects, and that these amounts were the best estimates that he could give as to the cost to the district of maintaining these particular projects, after having conferred with the road hands as to the number of loads of gravel hauled and the time consumed in doing the work, and also after having figured what he deemed to be the reasonable value of the use of the road machinery and equipment, and the gas and oil used in doing the work. This maintenance work was done by the district road hands upon the order and under the instructions of the defendant supervisor.

There were four other of such projects, that is to say where the road or driveway either lead from the public road in a half circle by the residence of one named person and then back into the highway, or which road leads from the public road down to the residence of such a person, and then circled in front of his house and came back over the same route to the public road, but which four projects were first constructed and later worked after a petition had been filed with the board of

supervisors and the statutory proceeding for establishing the same as roads had been undertaken, but each of these purported statutory proceedings were void for the reason that the board of supervisors did not adjudicate that ten of the persons who signed the petition for the laying out and opening of the road were freeholders or householders of the county interested in the road, and that the public interest or convenience required the road to be laid out and opened, as required by Section 8314, Code of 1942, supra. These proceedings were admitted in evidence over objection of complainants "for whatever the same may be worth," and they would have been competent to establish some color of right as a basis for a road by prescription, if the proposed roads had been in the nature of public roads under the statute involved, but the board had no jurisdiction under said Section 8314, Code of 1942, and statutes prior thereto, to esablish such proposed roads. These roads were: the Jack Moore road, costing the district $8.55; the Alton Horn road, costing the district $45.65; the Kyle Taylor road, costing the district $43.00; and the L. K. King road, costing the district $.55; or the total sum of $97.75, which we adopt as being the correct amount for these four projects according to the discovery under oath by the defendant supervisor, in the absence of sufficient proof by the complainants that these projects cost the district the larger sums alleged in the bill of complaint, or more than the sums admitted by the defendants.

The Hugh Coffee road was established, without statutory proceedings, and is in the same status as the 18 road projects hereinbefore first mentioned, but the discovery in the answer of the defendant supervisor did not cover the cost of this project, and there was no proof made by the complainants as to the cost thereof. The discovery merely stated that two loads of gravel were placed on the edge or the border inside of the right-of-way of the public road in front of the Hugh Coffee

place, requiring the services of one truck and one man for approximately one-fourth of one day.

The 18 projects hereinbefore mentioned were not instances of settlement roads being converted into a public road by prescription, dedication or under the statutory method, but were primarily for the use and convenience of the private individual by or to his residence the same was maintained. It is true that the doctor and peddlers, and in some instances the mail carrier, and others, used the road in going to and from the residence of such a private citizen, but that is true in regard to all settlement roads or private driveways, but there were not a sufficient number of freeholders or householders "interested in the road" to justify the establishment or the maintenance of the same as a public road within the exercise of the jurisdiction of the board of supervisors over roads "in accordance with such regulations as the Legislature may prescribe," as contemplated by Section 170 of the State Constitution of 1890, and Section 2890, Code of 1942, or the legislative policy declared pursuant to Section 170 of the State Constitution under Section 8314, Code of 1942.

As to the statutory method provided for under Section 8314, Code of 1942, supra, this Court held in the cases of Craft, Jr. v. De Soto County, 79 Miss. 618, 31 So. 204; Aden v. Board of Supervisors, 142 Miss. 696, 107 So. 753; and Ferguson v. Board of Supervisors, 149 Miss. 623, 115 So. 779, that it was necessary that the board of supervisors shall adjudicate that ten or more freeholders or householders of the county interested in the road have signed a petition, and the said Section 8314 of the Code contemplates that the board shall find that the public interest or convenience requires the road to be established, and that if it be determined that the prayer of the petitioners ought to be granted, in whole or in part, the board of supervisors shall appoint a committee of two members, of districts other than that of the road or proposed road, to examine and view the contemplated

route of the road, etc. These are regulations prescribed by the Legislature pursuant to Section 170 of the Constitution, to govern the board of supervisors in the exercise of its jurisdiction over roads. This legislative policy clearly shows that it has never been contemplated, since the adoption of Hutchinson's Code in 1848, and the subsequent codes hereinbefore cited as the origin of Section 8314, Code of 1942, supra, that a supervisor and a private landowner should establish a public road by the procedure of the landowner asking the member of the board of supervisors' district in which the road is to be located, to "build him a road" by or to his residence upon the landowner consenting to furnish the land and the member of the board of supervisors agreeing to build and maintain the road, and then thereafter carrying out such agreement, where the public generally is not interested in the road, or at least where other freeholders or householders are not interested in the road.

Typical of the manner in which these private road projects and driveways were established are the examples found in the testimony of Mr. Lewis Tatum, predecessor in office of the defendant supervisor, C. B. Shipp, when he would say, "Q. Are you familiar with a road that leaves the main public road some little distance from Mr. Miles house, where Mr. Browning lives now, and goes in a westerly direction and makes a circle and comes back in the public road? A. Yes, sir. * * * Q. Did you work that road? A. Yes, sir. * * * Mr. Miles asked me would I make him a road, and I said 'Will you give the county the right-of-way?' He says 'I will, and you can work it,' and I did it. He give me the right-of-way, and I graded the road up and kept on grading it. Graded it the whole time I was the Supervisor." Then he was asked about the Tom Browning road and his answer was, "Well, that happened like it did on the others. Mr. Browning himself asked me, told me he wanted me to build him a road and he would give me the right of way if I would grade it up, and I did and

worked it twice a year." After testifying that this made this private road a public road he was asked "Q. Who is traveling that road? A. Well, the doctor goes up there, and the mail rider goes up there, and the school bus goes up there sometime, and Emma Crawford, Nick Tyson and Alfred Crawford had a family of Negroes that lived up there and they used that road." Then he was asked about the S. A. Littleton road and he testified among other things that, " * * I fixed him a half crown, and I graded the road around by his house and back to the road." He also testified in regard to the Leroy Turpin road and said, "* * * he asked me to fix him a road and he would give me the right-of-way if I would fix it up for him, and I did." He testified that the doctor, peddlers and the "rolling grocery" goes there, meaning to Mr. Littleton's house. There was no "rolling grocery" when the writer of this opinion lived off the public road, but the doctor and the peddler came, the visit of the latter being somewhat of an event for the boys at our house.

The defendant supervisor Shipp testified that being unable to get a list of the public roads from the chancery clerk he got his predecessor in office, Mr. Tatum, to go with him for a period of four or five days to point out the roads which he had been theretofore maintaining as public roads, and that all of the road projects hereinbefore mentioned were pointed out to him by Mr. Tatum as a part of the public road system, and that he had merely maintained them since that time.

 We adhere to the principles announced in the case of Armstrong v. Itawamba County, 195 Miss. 802, 16 So. 2d 752, and numerous cases therein cited to the effect that a public road may be created by prescription or by dedication, as well as by being laid out and established in accordance with statutory provisions, where the general public or several freeholders or householders of the county are interested in the road, and where the public interest or convenience requires a road to be

established. ▓▓ ▓ Nor do we intend to depart from the well-settled rule that a settlement or neighborhood road may become a public road by prescription from user for the period required by law; and also that a public road may be established by dedication by the land-owner donating the right-of-way and where the public authorities accept the dedication by taking over and maintaining such a road at public expense, without having followed the statutory proceeding. ▓▓ ▓ But we are of the opinion that whether a road becomes public by prescription or by dedication, the public interest or convenience should require that the same be established and maintained as a public road.

▓▓ ▓ No question is involved in this case of any objection on the part of the landowners to the use of their land for a public road, without the same having been first established under the statutory method. The question here is whether or not the predecessor in office of the defendant supervisor had the lawful right to accept the offer of the landowner to furnish the land for the construction ''of him a road'' leading from the public road to his residence, or circling from the public road by his house and back into the public road, and to build or maintain the same at public expense. We do not think so. To so hold would mean that the road fund of a supervisors' district could be diverted from its legitimate purpose to the building or maintaining at public expense a road to the home of every citizen residing in such supervisors' district, and to the neglect of the roads which the public interest and convenience require to be maintained.

In justice to the defendant supervisor in the instant case, we deem it fair to repeat that each of the projects hereinbefore mentioned were constructed and maintained by his predecessor in office, Mr. Tatum, for a long period of time prior to the beginning of the first term of the defendant supervisor in 1944, and that he pointed out these driveways or private roads to the present super-

visor as being a part of the public road system of Supervisors' District No. 4. Neverthless, the action of Mr. Tatum in pointing out these projects as public roads where they had obviously been constructed and maintained for the convenience of the individual landowner, and also in telling the defendant supervisor, as his successor in office, that they were a part of the public road system of the district, could not make them so. The defendant supervisor is presumed to have known that he did not have the lawful right when he entered upon the duties of his office to maintain these private projects at public expense.

We are unable to agree with the holding of the trial court that this suit could not be maintained against the defendant supervisor and his surety alone and that the complainants should have sued the entire board of supervisors. As far as supervision of the working of the roads in a district is concerned, the supervisor from that district directs the road hands where to work, and controls the use of the road machinery of the district for that purpose. Moreover, according to the testimony of Mr. Tatum, the former supervisor and witness for defendants, the supervisor from the district approves the expenditures and then the entire board O. K.'s them.

Section 2944, Code of 1942, provides that: "If a board of supervisors shall appropriate any money *to an object not authorized by law,* the members of the board who did not vote against the appropriation shall be liable personally for such sum of money, to be recovered by suit in the name of the county, or in the name of any person who is a taxpayer who will sue for the use of the county, and who shall be liable for costs in such case." (Italics ours.)

Section 2945, Code of 1942, provides that: "Any member of the board of supervisors may have his vote, on any question before the board, recorded on the minutes of the board at the time of such vote, and a member who

voted against any unauthorized appropriation of money shall not be liable therefor.''

Thus it will be seen that Section 2944, supra, makes a member of the board of supervisors liable personally who did not vote against an unlawful appropriation, and that Section 2945, supra, provides how a member of the board may avoid liability by having his vote recorded on the minutes of the board, and further that a member who voted against any unauthorized appropriation of money shall not be liable therefor. Therefore it will be readily seen that if three members should vote for such an appropriation and two should vote against the same, it would be a vain and useless thing to sue all of the members of the board since Section 2945 expressly provides that a member voting against such an appropriation shall not be liable therefor. Moreover, this is a suit against the appellee C. B. Shipp and the surety on his official bond. Other members of the board may have given bonds in a different surety company, and a particular surety could not be liable or sued for the acts of other members of the board whose faithful performance of the duties of the office it has not guaranteed.

The complainants made out their case as to the particular projects hereinbefore enumerated by the testimony of the defendant supervisor as an adverse witness, and by the testimony of his predecessor in office as to the nature and character of the projects complained of, and the defendant supervisor testified that he maintained these projects, which had already been built and theretofore maintained by his predecessor, and that he had the employees of this supervisors' district to use the road machinery, equipment, and gasoline and oil for that purpose. He made no contention as a witness nor in his pleadings in the trial court, and does not make the contention here, that he did not vote for the payment of the gas and oil bills and for the salaries of his own employees whom he said he caused to do the work of maintaining these projects. It is to be assumed that he voted for the

payment of the work which he had authorized to be done. Under these circumstances, we are unable to agree with the trial court that it was incumbent upon the complainants to prove that the defendant supervisor voted for the illegal allowances complained of; and especially so since it does not appear that any separate allowances were made to the employees or for the payment of the oil and gas on these particular projects. These items were evidently included in the allowance made to cover the general expense of working the public roads each month. Such part of the allowances as covered the salaries of the employees for work on the public roads in the district and the oil and gas used in operating the machinery in working the public roads was legal and the defendant supervisor would not have been warranted in voting against the entire allowances for salaries, repairs and upkeep of machinery, and for gas and oil. This suit is for the recovery of such portion of the allowances as were for purposes not authorized by law, and the defendant supervisor disclosed the cost to the district of such projects in making his discovery under oath as contained in his answer, and has nowhere asserted that he did not vote for the same.

■■ ■■ Finally, the defendants have relied upon the leading case of Paxton v. Baum, 59 Miss. 531, and correctly contend that the members of the board are personally liable only for appropriations to any object not authorized by law, but we are of the opinion that an appropriation of public funds for the construction or maintenance of private roads or driveways is to an object not authorized by law. That case in holding that ''the jurisdiction over 'roads, ferries and bridges,' conferred on boards of supervisors by the Constitution, is subject to regulation as to the manner of its exercise by the Legislature, and must be exercised in conformity to law. Supervisors v. Arighi, 54 Miss. 668.'' The opinion in that case further states that: ''It is for money appropriated to something for which the law does not permit it to be ap-

propriated at all, in any way or under any circumstances, that members are personally liable. It is for a diversion of money from its legitimate objects and not for appropriation to a proper object, although in an irregular or unauthorized manner, that liability is imposed on members personally.'' This money was not appropriated to a proper object, in an irregular or unauthorized manner. The only proper object to which boards of supervisors may appropriate money in the exercise of their jurisdiction over roads is for the construction and maintenance of *public* roads. The members are liable for a diversion of public money to unauthorized objects.

It is true that Paxton v. Baum, supra, further states that '' * * * it could not have been the purpose of the Legislature to make members of boards of supervisors personally liable for errors or mistakes as to how to act in matters committed to such boards by law * * *,'' but there is not involved here ''errors or mistakes as to how to act in matters committed to such boards by law,'' but there is here involved an intentional act in appropriating money for the maintenance of private roads which were not committed to the board by law. The opinion in that case further states: ''It is when they disregard the law as to the objects to which it has devoted the public money, and divert it to some object to which the law has not devoted it, that personal liability attaches.'' We think that such was the case in the action of the defendant supervisor in the instances hereinbefore enumerated.

If the board of supervisors had been given jurisdiction over private roads and driveways, then a different question would be presented here, and the holding of Paxton v. Baum, supra, would bar a recovery in the instant case. Likewise, the defendants are not protected by the holding of the Court in the case of State, to Use of Lincoln County v. Green, 111 Miss. 32, 71 So. 171, since he (the defendant supervisor) had no judgment or dis-

cretion conferred upon him to be exercised in regard to private roads and driveways.

 ██ As to the four road projects where the void statutory proceedings are relied on, the board of supervisors had no jurisdiction to establish such projects as public roads under Section 8314, Code of 1942, supra, even if it be conceded that the failure to adjudicate that ten or more freeholders or householders of the county interested in the road had signed the same may have been sufficient as color of right, followed by user, to convert a settlement or neighborhood road into a public road in cases where the public interest or convenience required the road to be established.

From the foregoing views it follows that we are of the opinion that the complainants are entitled to a decree here on behalf of the Supervisors' District No. 4 of Lafayette County for the sums of $295.83 and $97.75, or the total sum of $393.58, against the appellee C. B. Shipp and the appellee United States Fidelity & Guaranty Company as surety on his official bond, this being the admitted cost of the projects hereinbefore enumerated; that the appellee C. B. Shipp as supervisor of the said supervisors' district should be henceforth enjoined, restrained and prohibited from any further illegal use of the road machinery and equipment, and of the employees, and of the materials and supplies of the said supervisors' district in the maintenance of the private road projects or driveways hereinbefore enumerated, the trial judge having found as a fact in his opinion that: ''From the proof taken, there is no doubt but that there was, to place it mildly, an unlawful expenditure of public funds.''

The decree appealed from must be affirmed as to a majority of the projects complained of for the reason that the state of the proof as to them is not such as to clearly show that the trial court was in error. But we think that the decree is erroneous to the extent that it held that the suit would not lie against the defendant

supervisor and his surety alone, and in holding that the complainants were required under the state of this record to meet the burden of proving specifically that the said supervisor voted for these illegal allowances; and in holding that the bill of complaint should be dismissed; also in denying in toto the writ of injunction prayed for, the trial judge being of the opinion that although the injunction should be denied, the same might lie "if he continues to expend the funds or if he is threatening to continue to expend the funds, * * * " evidently having reference to the "unlawful expenditure of public funds" which he thought had been shown from the proof taken.

A decree will be accordingly rendered here in favor of the complainants against the defendant and his said surety for the sum of $393.58, and the injunction is directed to be issued against the appellee defendant supervisor to the extent of the further maintenance of the private roads and driveways hereinbefore enumerated.

As an afterthought and as an addition to the foregoing views expressed in this opinion, we desire to state that nothing herein contained should be construed as prohibiting an alteration or change in a public road so as to eliminate curves or where the public interest or convenience may otherwise require the same to be altered or changed, even though the new construction as a short-cut or change may pass the residence of not more than one private citizen, since such changed public road would presumably continue to serve the public interest or convenience.

Affirmed in part, reversed in part, and decree here for the appellants.

*Hall, Kyle, Holmes* and *Gillespie, JJ.,* concur.