973 So.2d 273 (2008)
COR DEVELOPMENTS, LLC, et al., Appellants
v.
COLLEGE HILL HEIGHTS HOMEOWNERS, LLC, Appellee.
No. 2006-CA-01810-COA.
Court of Appeals of Mississippi.
January 15, 2008.
*275 Lawrence Lee Little, Tara Beth Scruggs, attorneys for appellants.
Omar D. Craig, Oxford; attorney for appellee.
Before KING, C.J., CHANDLER and ISHEE, JJ.
CHANDLER, J., for the Court.
¶ 1. College Hill Heights Homeowners, LLC (the homeowners) filed a complaint in the Chancery Court of Lafayette County *276 requesting an injunction to prevent COR Developments, LLC (COR) from building a fifty-unit condominium development on seven lots in the subdivision. After a hearing, the chancery court granted the injunction, finding (1) that the planned development contravened restrictive covenants applicable to the lots and (2) that COR had not followed the statutory procedure required to alter the recorded subdivision plat. COR appeals, contending that the chancellor erred (1) by finding that the proposed development constituted a resubdivision of the lots in violation of the restrictive covenants; (2) by ignoring the plain language of the restrictive covenants; and (3) by finding that the proposed development altered the plat of College Hill Heights subdivision.
¶ 2. Although this appeal presents several, questions for decision, including whether the condominium development was a "subdivision by subterfuge," the dispositive question is whether COR had to pursue a statutory plat vacation procedure outlined at Mississippi Code Annotated section 17-1-23 (Rev.2003) or section 19-27-31 (Rev. 2003) in order to proceed with the condominium development. We answer this question in the affirmative and affirm the chancellor's grant of an injunction preventing COR from proceeding with the condominium development or altering the subdivision plat until it secures leave to do so from the appropriate authority pursuant to section: 17-1-23(4) or section 19-27-31. We reverse the chancellor's determination that the condominium development was prohibited by the restrictive covenants running with the land.

FACTS
¶ 3. College Hill Heights is a residential subdivision located in Lafayette County northwest of the city limits of Oxford, Mississippi. The subdivision abuts the west side of College Hill Road. The original plat of the subdivision was recorded by the Lafayette County Chancery Court Clerk on July 17, 1961, by. owner J.L. Adams. This plat showed forty-three lots with access provided by two streets, College Hill Drive and Adams Lane. College Hill Drive formed a loop with each end connecting to College Hill Road. To the south, Lots 3-14 were arranged along Adams Lane, which provided access from College Hill Road and ended in a cul-de-sac. College Hill Drive and Adams Lane did not intersect. In an owner's certificate filed with the plat, Adams expressed his intent to dedicate the platted streets. A revised plat showing utility easements and lot dimensions was recorded on May 26, 1962.
¶ 4. On May 9, 2005, COR purchased a tract consisting. of Lots 6, 7, 8, 9, 10, 19, and 20 from John M. Rogers and Martha L. Rogers. COR hirod Precision Engineering Corporation to develop a plan for a fifty-unit condominium development on the subject lots to be named "Hickory Cove." The development was to consist of one- and two-story condominiums from 1,000 square feet to 1,800 square feet. On May 23, 2005, Kenny McCullough, a member of COR, and Ryland Sneed, a registered licensed surveyor with Precision Engineering, appeared before the Lafayette County Planning Commission and obtained preliminary approval for Hickory Cove. No representative of COR ever appeared before the Board of Supervisors concerning approval. Nor did COR notice the other landowners in the subdivision or publish any notice of the condominium development. COR cleared the land and began construction on Unit 27, attracting the attention of neighboring property owners.
¶ 5. On September 9, 2005, the homeowners filed a complaint to enjoin COR from proceeding with the condominium development. The homeowners alleged that *277 Hickory Cove, as planned, violated the restrictive covenants running with the land. The homeowners also complained that COR had not followed statutory procedures for altering or vacating the recorded subdivision plat. The homeowners claimed that the development would (1) increase traffic flow in the subdivision, (2) increase demands on the water and sewerage system serving the subdivision, (3) increase the density of structures and occupants to an extent materially affecting the health, safety, and welfare of the entire subdivision, and (4) cause diminution of value of the other developed and undeveloped lots within the subdivision.
¶ 6. The restrictive covenants were contained in a warranty deed conveying Lots 1-20 from Adams Real Estate, Inc., to Gilbert and Joyce M. Lomax on April 24, 1970. The deed stated:
As part of the consideration for this conveyance, Lots 3 through 20, inclusively, are not to be re-subdivided, are to be used for single or multi-family residential purposes only; and no residential structure shall be constructed on said lots which does not have a fair market value including the value of the land of at least $15,000.00 for singlefamily residences, or $22,000.00 for multi-family residences based upon the latest published commodity price index of the United States Government. These covenants and restrictions are to be construed as covenants running with the land.
The warranty deed from the Rogerses to COR stated that "[t]he warranty herein contained is subject to, and there is excepted therefrom, those certain restrictive covenants set out and contained in [the Lomax deed]." The homeowners sought to show that the planned fifty-unit condominium development violated they prohibition against re-subdividing the lots and/or that the condominiums violated the restriction that the lots be used for "single or multi-family residential purposes only." COR put on testimony that a condominium development is considered to be a multi-family use and that, due to the unique way in which condominiums are owned, a condominium development does not require subdividing the property on which the development lies.
¶ 7. The homeowners also sought to prove that the Hickory Cove project required statutory alteration of the recorded College Hill Heights subdivision plat because the project would obliterate the platted interior lot lines, utility easements, and a portion of the right-of-way of Adams Lane. Two sections of the Mississippi Code of 1972 Annotated prescribe procedures through which a landowner may secure alteration or vacation of a map or plat. Mississippi Code Annotated section 19-27-31 (Rev.2003) permits the landowner to petition the chancery court for relief, naming the persons adversely affected or directly interested in the proposed alteration or vacation of the map or plat. Alternatively, under section 17-1-23(4), the landowner may secure relief by petitioning the Board of Supervisors provided the petition includes the written agreement of all adversely affected or directly interested parties. Under these statutes, a landowner wishing to alter or vacate a map or plat may seek relief from the Board of Supervisors only if the landavVner has obtained approval from all directly interested or adversely affected persons; otherwise, the landowner's sole avenue for relief is by petitioning the chancery court under section 19-27-31.
¶ 8. Throughout the proceedings, COR maintained that Hickory Cove would not require alteration or vacation of the recorded plat of the College Hill Heights subdivision and for that reason the chancery *278 court procedure, with its requirement of notice to directly interested or adversely affected persons, was unnecessary for COR to proceed with the development. It was established that the recorded plat of College Hill Heights subdivision showed utility easements on each of the seven lots owned by. COR. The plat showed that Lots 6, 7, 8, 9, and 10 abutted Adams Lane, with Lots 7, 8, 9, and 10 situated on the cul-de-sac. Lots 19 and 20 were behind Lots 9 and 10 and fronted College Hill Drive.
¶ 9. According to the map of the Hickory Cove project that was admitted into evidence, the development's fifty freestanding condominium units were to be situated around a circular road with access from College. Hill Drive through Lots 19 and 20. Ryland Sneed, a registered land surveyor, testified that according to the plan for Hickory Cove, there would be units on all seven lots, with some situated over the interior lot lines and utility easements depicted on the recorded subdivision plat. Also, the Hickory Cove development would utilize a portion of the platted Adams Lane, including the entire cul-de-sac, for condominium units and common areas.
¶ 10. Sneed stated that, although Adams Lane appeared on the College Hill Heights subdivision plat, the lane had never been constructed or opened and did not "exist on the ground." He further testified that an owner of Lots 3, 4, 11, 12, 13, and 14, which together abutted College Hill Read, had built a house partially obstructing the Adams Lane right of way.[1] In Sneed's opinion, Adams Lane was unusable as platted due to this obstruction. Sneed stated that the utility easements shown on the plat were undeveloped and would be "obliterated" or moved to different locations as needed' to provide utility service to the condominiums. Sneed opined that because Hickory Cove would not exceed the exterior boundaries of the subdivision, the recorded subdivision plat did not require alteration to reflect the changes to be wrought by Hickory Cove. Corbert Jones, a county planner for Lafayette County, testified that, in his opinion, Hickory Cove would be a revision or alteration of the recorded plat of College Hill Heights subdivision.
¶ 11. The chancery court found that the planned condominium development was, in practical effect, a "subdivision by subterfuge" in violation of the restrictive covenants prohibiting re-subdivision of the seven lots. Further, the chancellor found that the Hickory Cove project contravened the restrictive covenants because the covenant drafters had intended a family-type subdivision and they could not have envisioned that "multi-family" development could signify a condominium project with "one hundred and fifty-three parking spaces."[2] Also, the chancellor found from Jones's testimony that Hickory Cove did require an alteration of the recorded plat of College Hill Heights subdivision. The chancellor stated, "there was not only a violation or an alteration of this plat, there is virtually an obliteration of this plat and alteration thereof without authorization, without following the proper statutory procedures. . . ." The chancellor found that insufficient notice had been given as required under the plat vacation statute and that the plat was not properly vacated though it would be altered by the proposed condominium development. In a September 19, 2006, order dated nunc pro tunc *279 August 29, 2006, the chancellor decreed that COR was enjoined from developing Hickory Cove as proposed and approved. Likewise, the order enjoined COR from altering the recorded plat of College Hill Heights subdivision until full compliance with the statutes occurred.

STANDARD OF REVIEW
¶ 12. This Court's review of the deem. sion of a chancellor is limited. Nichols v. Funderburk, 883 So.2d 554, 556(¶ 7) (Miss. 2004). We will reverse only when the chancellor's determinations were manifestly wrong, clearly erroneous, or lacked the support of substantial, credible evidence. In re Estate of Holmes, 961 So.2d 674, 679(¶ 11) (Miss.2007). However, we review all questions of law de novo. Bailey v. Estate of Kemp, 955 So.2d 777, 781(¶ 15) (Miss.2007).

LAW AND ANALYSIS
I. WHETHER THE CHANCELLOR ERRED BY FINDING THAT THE PROPOSED HICKORY COVE DEVELOPMENT CONSTITUTED A RE-SUBDIVISION OF LOTS 6, 7, 8, 9, 10, 19, AND 20 OF COLLEGE HILL HEIGHTS SUBDIVISION.
¶ 13. Attacking the chancellor's finding that Hickory Cove constituted a "subdivision by subterfuge," COR argues that Hickory Cove would not violate the covenant against re-subdividing the lots because a condominium development does not necessitate subdivision of the property on which it lies. COR points to the testimony of Corbert Jones. Jones testified, "[olvvnership does not affect the dividing of the lots" such that there could be several condominium units on one lot but the sale of one of those units would not divide the lot. According to Charles Wren, an engineer and former planning director for Lafayette County, in a condominium development there is no division of land into tracts or parcels. For that reason, Wren testified, the planning commission subjects condominium developments to a site plan review procedure that is more relaxed than the formal review procedure for new subdivisions, which requires final approval by the Board of Supervisors. Wren stated that the primary purpose of presenting a new condominium development to the planning commission is merely to notify the county of the new addresses and new utility requirements, and no Board of Supervisors approval is required.
¶ 14. Title 89, Chapter 9 of the Mississippi Code of 1972 Annotated contains the Mississippi Condominium Law. MissCode Ann. § 89-9-1 (Rev.1999). "Condominium" is defined as "that form of ownership of property under which units of improvements are subject to ownership by different owners and there is appurtenant to each unit as part thereof an undivided share in the common areas." Miss.Code Ann. § 89-9-5(1) (Rev.1999). A condominium is an estate in real property. Miss. Code Ann. § 89-9-7 (Rev.1999). It consists of the following:
an undivided interest in common in a portion of a parcel of real property together with a separate interest in space in a residential, industrial, or commercial building on such real property, Such as an apartment, office, or store. A condominium may include in addition a separate interest in other portions of such real property.
Id. The estate may "be in fee simple, leasehold, or any other estate in real property recognized by law." Id. A "unit" is those elements of a condominium which are not owned in common with the other condominium owners in the project. Miss. Code Ann. § 89-9-5(2) (Rev.1999). "Common areas" comprise the entire project except the units. Miss.Code Ann. § 89-9-5(4) *280 (Rev.1999). Property taxes are assessed on the unit and common areas, not on the project as a whole. Miss.Code Ann. § 89-9-31(1) (Rev.1999). Each unit, with common areas, is separately assessed as a single parcel for ad valorem takes and special assessments. Id.
¶ 15. Hickory Cove was planned as a fifty-unit condominium development. We must determine whether the establishment of Hickory Cove on the seven lots would constitute a re-subdivision of those lots in violation of the restrictive covenants. The general rule concerning restrictive covenants in Mississippi is that in the case of ambiguity they will be construed most strongly against the party seeking to enforce the restriction. City of Gulfport v. Wilson, 603 So.2d 295, 299 (Miss.1992) (quoting Kemp v. Lake Serene Prop. Owners Ass'n, Inc., 256 So.2d 924, 926 (Miss.1971)). However, "[t]he language of restrictive covenants, is to be read `in its ordinary sense,' considering the entire document as well as the circumstances surrounding its formulation to ascertain its meaning, purpose and intents." Stokes v. Bd. of Dirs. of La Cav Improvement Co., 654 So.2d 524, 527 (Miss.1995). A restriction expressed in unambiguous language will be enforced. Andrews v. Lake Serene Prop. Owners Ass'n, Inc., 434 So.2d 1328, 1331 (Miss.1983). But, the restrictions should not be extended by strained construction, especially, when the use sought to be restricted is clearly permitted by the covenants. Wilson, 603 So.2d at 299 (quoting Kinchen, v. Layton, 457 So.2d 343, 346 (Miss.1984)),
¶ 16. In Lake Castle Lot Owners Ass'n v. Litsinger, 868 So.2d 377, 380(¶ 12) (Miss.Ct.App.2004), this Court considered an argument that the relocation of an interior lot line was a re-subdivision of the lots in violation of protective covenants. Just as in this case, the covenants did not define the term "re-subdivision." Id. The property owner, seeking to move the line, argued that "re-subdivision" was incapable of being defined or that the relocation of an interior lot line was not a re-subdivision because such action does not create a new lot, Id. The lot owners' association contended the line relocation was a re-subdivision, and the word "subdivision" means "to divide a part into smaller parts of the same thing or subject matter and the prefix `re' simply means to do it again." Id. at (¶ 13). The Court did not determine the meaning' of "re-subdivision" because even applying the definition urged by the lot owners' association the relocation of the line between two lots created no smaller parcel; thus, it did not constitute a re-subdivision. Id. at 380(¶ 14).
¶ 17. COR promotes a definition of "subdivision" as "the division of a thing into smaller parts." Black's Law Dictionary 1437 (7th ed.2000). COR argues that a condominium development involves division of ownership of the land rather than division of the land itself; therefore, a condominium development does not meet its definition of subdivision and does not constitute a re-subdivision of the lots. The homeowners do not take issue with COR's proposed definition, but they argue that the division of the seven lots into fifty condominiums could be nothing other than subdivision of the platted lots.
¶ 18. Mississippi Condominium Law specifically states that what is divided in a condominium project is not a tract of land, but the ownership thereof. Miss.Code Ann. § 89-9-5(5) (Rev.1999). A condominium development splices the ownership of a tract of land into multiple estates, each consisting of a unit coupled with a share of the common areas. Miss.Code Ann. § 89-9-5(1). It does not involve the creation of new, smaller lots from the extant tract. We must determine whether the word "re-subdivided," *281 contained in the covenants, encompassed division of ownership of the encumbered lots. Certainly, the term "re-subdivided" does not plainly or unambiguously mean division of land ownership, and we conclude that the term cannot be interpreted so broadly. Construing the term "re-subdivided" most strongly against the homeowners and in favor of COR, the prohibition that the lots were not to be re-subdivided meant that the platted lots were not to be divided into smaller tracts of land and then re-platted as a subdivision. It would be unreasonable to find that the covenant drafters intended that a lot owner, who alienated a portion of a lot without assigning it a separate lot number, was engaged in prohibited re-subdividing. This is especially so in light of the covenant's allowance of multi-family residential structures on the lots, which contemplates more than one property owner per lot. We find that the chancellor manifestly erred by finding that the condominium development violated the covenant against re-subdividing the lots.
II. WHETHER THE CHANCELLOR ERRED BY PROVIDING HIS OWN INTERPRETATION OF THE INTENT OF THE PROTECTIVE COVENANTS APPLICABLE TO LOTS 6, 7, 8, 9, 10, 19 AND 20 OF COLLEGE HILL HEIGHTS SUBDIVISION.
¶ 19. The covenants specifically permitted use of the property for multi-family, residential purposes provided that a multi-family residential structure on the lots have a fair market value of more than $22,000, based upon the latest published commodity price index of the United States government. The trial testimony established that the fair market value of each condominium structure would far exceed that required by the covenants. The chancellor found that the Hickory Cove project would violate the covenants because the covenant drafters could not have envisioned that multi-family residential purposes could include a fifty-unit condominium development. COR argues that this finding ignored the plain language of the covenants and substituted the chancellor's own contrary interpretation.
¶ 20. We have already determined that the covenant against re-subdividing the lots did not prohibit the Hickory Cove development. Now, we consider whether the chancellor correctly found that the covenants prohibited Hickory Cove because the drafters could not have intended this type of condominium development. The sole evidence concerning the meaning of the term "multi-family" was the testimony of Sneed and Jones that condominiums were considered multi-family residences for zoning purposes. There was no evidence brought, out at the hearing regarding whether, at the time of the drafting of the covenants in 1970, the phrase "multi-family residential purposes" would have been understood to include a condominium development. At oral argument in this case, the, homeowners expressed their belief that the covenants would permit condominiums or duplexes' provided the structures were located within the interior lot lines and setback lines and the right of way of Adams Lane was undisturbed. The homeowners opined that, with these restrictions, two condominiums or duplexes per lot would be the feasible limit.
¶ 21. When the language of a restrictive covenant is ambiguous, the circumstances surrounding the formation of a restrictive covenant must be considered in addition to the language of the covenant to ascertain its meaning, purpose, and intent. Stokes, 654 So.2d at 527. Ambiguous covenants are to be construed most strongly against the party seeking to enforce the *282 restriction, here, the homeowners. Wilson, 603 So.2d at 299. It is apparent from the chancellor's finding that he considered the term "multi-family residential use" to be ambiguous as to whether this use would include the Hickory Cove condominium project. Having found the term ambiguous, the chancellor looked to the intent of the covenant drafters and found that they could not have intended a large-scale development like Hickory Cove. However, no evidence was brought out at the hearing pertaining to whether, in 1970, the term "multi-family residential purposes" would have included condominiums. All of the evidence before the chancellor pertaining to the definition of multi-family residential use was that it included condominiums. By finding that the covenant's drafters intended to prohibit condominiums, the chancellor effectively construed the covenants against COB and in favor of the homeowners. This, was manifest error. We, find that the chancellor clearly erred in finding that the covenants prohibited a condominium development like Hickory Cove.
III. WHETHER THE CHANCELLOR ERRED IN FINDING THAT HICKORY COVE WOULD AMEND AND OBLITERATE THE ORIGINAL PLAT OF COLLEGE HILL HEIGHTS SUBDIVISION.
¶ 22. Authority is bestowed upon the chancery court by section 19-27-31 to alter, or vacate maps and plats upon petition by a landowner. Miss.Code Ann. § 19-27-31; City of Wiggins v. Breazeale, 422 So.2d 270, 272 (Miss.1982). Section 14-127-31 states:
If the owner of any land which shall have been laid off, mapped, or platted as a city, town or village, or addition thereto, or subdivision thereof, or other platted area, whether inside or outside a municipality, shall be desirous of altering or vacating such map or plat, or any part thereof, he may, under oath, petition the chancery court for relief in the premises, setting forth the particular circumstances of the case and giving an accurate description of the property, the map or plat of which is to be vacated, or altered, and the names of the persons to be adversely affected thereby, or directly interested therein. The parties so named shall be made defendants thereto, and publication of summons shall be made one time in a newspaper published, or having a general circulation, in the county where the land is situated, and which publication shall clearly state the objects and purpose of the petition.
At any time after the expiration of five days from said publication and the service of process upon the named defendants, the cause or proceeding shall be triable, and the court in term time or the chancellor in vacation may hear the petition and all objections from any person thereto, and may decree according to the merits of the case. However, where all adversely affected or directly interested persons join in said petition, the same may be finally heard and determined by the court or chancellor at any time. If the decree vacate, in whole or in part, or alter the map or plat, it shall be recorded as a deed, and a memorandum thereof noted on the record of the map or plat.
A more`recently enacted statutory subsection gives the Board of Supervisors authority to alter or vacate a map or plat upon petition by the landowner, desiring the change, accompanied by the written agreement of the persons to be adversely affected by or directly interested in the change. Section 17-1-23(4) states:
If the owner of any land which shall have been laid off, mapped or platted as *283 a city, town or village, or addition thereto, or subdivision thereof, or other platted area, whether inside or outside a municipality, desires to alter or vacate such map or plat, or any part thereof, he may petition the board of supervisors of the county or the governing authorities of the, municipality for relief in the premises, setting forth the particular circumstances of the case and giving an accurate description of the property, the map or plat of which is to be vacated or altered and the names of the persons to be adversely affected thereby or directly interested therein. However, before taking such action, the parties named shall be made aware of the action and must agree in writing to the vacation or alteration. Failure to gain approval from the parties named shall prohibit the board of supervisors or governing authorities from altering or vacating the map or plat, or any part thereof. Any alterations of a plat or map must be recorded in the appropriate location and a note shall be placed on the original plat denoting the altered or revised plat. No land shall be subdivided nor shall the map or plat of any land be altered or vacated in violation of any duly recorded covenant running with the land.
¶ 23. The evidence established that Hickory Cove, as planned, would involve building condominiums over interior lot lines, utility easements, and a portion or the right of way of Adams Lane, all features depicted on the recorded plat of College Hill Heights subdivision. The chancellor held that building Hickory Cove would necessitate statutory alteration or the plat and enjoined COR from proceeding with construction of Hickory Cove until such time as it had secured alteration of the plat in conformance with statutory procedures. COR contends that this ruling was error, advancing the alternative arguments that (1) compliance with the statutory plat alteration procedure is not mandatory; (2) the plat alteration procedure was unnecessary because Hickory Cove would not create new interior lot lines or require alteration of the exterior boundaries of the subdivision; (3) the plat of College Hill Heights has already been altered through the abandonment of Adams Lane and the utility easements; and (4) building over interior lot lines does not require alteration of a plat.
¶ 24. COR first argues that compliance with the statutory procedure is permissive, not mandatory, because both statutes provide that a landowner desiring to alter a plat "may" petition for relief. In other words, COR argues, a landowner may alter a map or plat without resorting to the procedure under either statute. This argument is without merit. The primary rule of statutory construction requires this Court to determine the intent of the Legislature "from the statute as a whole and from the language used therein." MIC Life. Ins. Co. v. Hicks, 825 So.2d 616, 621(¶ 12) (Miss.2002). If possible, this Court must read the entire statute in a manner that harmonizes all of its parts consistent with its scope and object. McKnight v. Mound, Bayou Pub. Sch. Dist, 879 So.2d 493, 497-98(¶ 15) (Miss.Ct. App 2004) (quoting Ellison v. Mobile & O.R. Co., 36 Miss. 572, 585 (1858)). And, we "will not impute an unjust or unwise purpose to the legislature when any other reasonable construction' can save it from such/imputation." Gambrill v. Gulf States Creosoting Co., 216 Miss. 505, 510, 62 So.2d 772, 775 (1953).
¶ 25. Section 19-27-31 requires mandatory notice and an opportunity to be heard for those persons directly interested in or adversely affected by a landowner's proposed alteration or vacation of a map or plat, followed by an adjudication on the *284 merits by the chancery court. It is only when the directly interested or adversely affected persons agree in writing that the landowner may secure the vacation or alteration from the Board of Supervisors under section 17-1-23(4). It would be absurd for the Legislature to have intended for the landowner, at his option, to forego these procedures, yet secure identical relief. Moreover, the supreme court has consistently viewed the statutory plat alteration procedure as mandatory for a landowner to secure alteration or vacation' of a plat or map. See Barrett v. Ballard, 483 So.2d 304, 306 (Miss.1985); Reinecke v. Reinecke, 105 Miss. 798, 806, 63 So. 215, 216 (1913). In these statutes, the word "may" merely signifies that a landowner may seek relief under the statutes, or instead may content himself with the status quo.
¶ 26. COR's next argument relies on an Attorney General's opinion for the proposition that the statutory plat alteration procedure is not implicated because Hickory Cove would not create new interior lot lines or change the external boundaries of the subdivision. In the Attorney General's opinion, a developer wanted to convey a portion of a platted tract but not assign the portion a separate lot number, and the city attorney wanted to know whether the developer had to comply with section 19-27-31. COR relies on the following language:
This office has opined that Section 19-27-31 sets out the procedure to change a subdivision plat. It does not dictate when or under what circumstances a plat must be changed. One can convey a portion of a lot without giving the conveyed portion a separate lot number and without having the conveyance marked off on the subdivision plat. However, if the external boundary of the subdivisions are to be changed, or if the portion which is to be resubdivided is to be given a separate lot number and be designated on the plat, then the official subdivision plat would necessarily have to be amended pursuant to Section 19-27-31. MS AG Op. Gamble, (May 12, 1993).
Further, we have opined there is no requirement that an amended plat be filed every time a portion of a lot is conveyed by deed to another. In other words, one can convey a portion of a lot without giving the conveyed portion a separate lot number and without having the conveyance marked off on the subdivision plat. MS AG Op. Lacoste (May, 1991).
Op. Att'y Gen. Mitchell (May 17, 2002). "An attorney general's opinion is entitled to careful consideration and regarded as persuasive; however, the opinion i[s] not. binding upon the court considering the same question of law." Blackwell v. Miss. Bd. of Animal Health, 784 So.2d 996, 1000(¶ 9) (Miss.Ct.App.2001). While the Attorney General's opinion states that assigning a portion of platted land a separate lot number or changing the external boundaries of a subdivision requires the statutory plat alteration procedure, the opinion does not limit the applicability of the statutory procedure to solely those circumstances.
¶ 27. The evidence showed that Hickory Cove would involve building condominium units over: (1) platted interior lot lines, (2) a portion of the platted Adams Lane right of way, and (3) platted utility easements. COR argues that a landowner owning adjoining lots may build improvements over interior lot lines without having to petition for alteration of the subdivision plat. Concerning the easements and road right of way, COR argues that these features have been abandoned; thus, the plat has already been altered. We find that COR's *285 plan to incorporate part of the platted right of way of Adams Lane into its private condominium development and to obliterate or move the platted utility easements were sufficient to mandate its compliance with the statutory plat alteration procedures.
¶ 28. A landowner's development of platted land in a manner conflicting with streets and easements appearing on the plat has been recognized as an activity requiring compliance with the statutory procedures. Barrett, 483 So.2d at 305; Breazeale, 422 So.2d at 272. In Barrett, a recorded plat reflected a subdivision designed for single-family dwellings located in the City of Philadelphia. Barrett, 483 So.2d at 305. The plat showed that streets would be constructed through the subdivision. Id. The city subsequently re-zoned the subdivision for commercial uses, and a developer began constructing multi-family housing on the property. Id. However, the water and sewer lines had already been laid pursuant to the single family plat, and the city informed the developer that its construction obstructing the lines was unauthorized. Id. The developer filed a petition, joined by the city, to vacate the plat pursuant to section 19-27-31, arguing that the plat should be vacated because the platted streets were never constructed. Id. The petition was granted by the chancery court. Id. Shortly thereafter, nearby landowners petitioned to set the decree aside, arguing that they had not been given proper notice under the statute. Id. They further argued that the deletion of the platted streets imposed a severe hardship, on them by diminishing the value of their property and limiting their access to a street running south of the subdivision. Id. Forty-nine other citizens of Philadelphia subsequently filed a motion to intervene. They argued that they were affected by the decree vacating the plat, and they had never received any statutory notice. Id. The chancellor denied the motion to intervene and the original petition for lack of due diligence. Id.
¶ 29. The supreme court reversed the judgment of the chancery court because the developer and city had failed to comply with the statutory notice procedure contained in section 19-27-31. Id. at 306. They had never published a summons in a county newspaper of general circulation. Id. at 305. The supreme court stated:
The Barretts and the forty-nine other would-be intervenors may have rights subject to adjudication and could be adversely affected by the proceedings begun by [the developer]. It is axiomatic that before one may be judicially deprived of a right, he must be given (a) reasonable advance notice of a hearing, at which (b) he is afforded a meaningful opportunity to assert and defend that right. [citations omitted.]
This principle of hornbook constitutional law has been implemented in the legislative enactment which vests in the chancery courts authority to hear and adjudicate a proceeding to alter or vacate a plat.
Id. The court held that the decree vacating the plat was invalid because it was obtained without legally adequate and timely notice as required by, the statute. Id. at 306-07.
¶ 30. To like effect is City of Wiggins, involving the deletion of streets from a plat In that case, Breazeale filed la petition under section 19-27-31 to vacate portions of two platted city streets, averring that the portions had never been opened or used as streets and were of no value to anyone save Breazeale. Breazealei 422 So.2d at 270. The city argued that the chancery court lacked jurisdiction to entertain the petition because another statute gave the city jurisdiction to close streets. *286 Id. The supreme court rejected the city's argument and held that both a municipality and the chancery court possess authority to close and vacate streets. Id. at 272. Focusing on the applicability of section 19-27-31 to the closing of streets and other public ways, the supreme court stated:
Where the part of a plat or subdivision to be altered involves a street, alley, .or property dedicated to the public, the, logical sense of the statute is that such areas have never been opened and used for those purposes. When the plat is altered or vacated, those areas, for all practical purposes, are expunged from the plat and it becomes a recorded plat with such street, alley, or public property not included or appearing therein.
Id. at 271. The supreme court noted the statutory requirement that persons adversely affected by or directly interested in a proposed plat alteration, including the municipality or county, be given notice and the right to appear, object, and give reasons why the plat should not be altered or vacated. Id.
¶ 31. Pursuant to Barrett and Breazeale, we hold that COR was required to secure alteration of the plat before proceeding with development that would obliterate a significant portion of the platted right of way of Adams Lane and all the platted utility easements on the subject lots,
¶ 32. We now address COR's argument that, even if plat alteration was required for it to proceed with the construction of Hickory Cove, the plat has already been altered through the nonuse of Adams Lane and, the utility easements. COR avers that Adams Lane was never dedicated to public use and that, even if it was, its non-use as a public thoroughfare and the construction of a house in its right of way amounted to an abandonment by the county such that the land reverted to the abutting landowners. In resolving this issue, we first discuss the law applicable to COR's arguments about the legal status of Adams Lane and the utility easements and then proceed to COR's contention that their non-use has altered the plat of College Hill Heights subdivision.
¶ 33. The protracted non-use of a public road for an extended period of time creates a presumption of abandonment. R & S Dev., Inc. v. Wilson, 534 So.2d 1008, 1010 (Miss.1988). This presumption is strengthened by acts acquiesced in by the governing authority which are inconsistent with a public right and show an intent to abandon, such as the placement of physical obstructions in the public way. Id. at 1011. These principles are applicable to county roads as well as to municipal streets. McNeely v. Jacks, 526 So.2d 541, 544 (Miss.1988) ("if the public's exclusion from a public [county] road is so complete and continuous that, were adverse possession being claimed against a record title holder the claim would be honored, our law decrees abandonment."). Easements also may be abandoned through protracted non-use for an extended time period. Bivens v. Mobley, 724 So.2d 458, 461(¶ 11) (Miss.Ct.App.1998).
¶ 34. COR also disputes that Adams Lane ever became a county road subject to abandonment because its dedication was never accepted by the county. The homeowners argue that Adams Lane is a dedicated public road, pursuant to Mississippi Code Annotated 17-1-23(3). Section 17-1-23(3) provides that where a map or plat is submitted to and approved by the governing authorities of a municipality, all streets; roads, alleys and other public ways shown on the plat are dedicated to public use. These platted roads, whether opened or unopened, cannot be used otherwise unless the plat is vacated in the manner *287 provided by law. Miss.Code Ann. § 17-1-23(3). Though urged by the homeowners, this statute does not govern in the present case because it applies only to municipalities, not counties. However, it is the law in this State that:
a public road may be created by prescription or by dedication, as well as by being laid out and established in accordance with statutory provisions, where the general public or several freeholders or householders of the county are interested in the road, and where the public interest or convenience requires a road to be established . . . [A] settlement or neighborhood road may become a public road by prescription from user for the period required by law; and also . . . a public road may be established by dedication by the landowner donating the right-of-way and where the public authorities accept the dedication by taking over and maintaining such a road at public expense, without having followed the statutory proceeding.
Coleman v. Shipp, 223 Miss. 516, 530-31, 78 So.2d 778, 784 (1955) (emphasis added); see Miss.Code Ann. § 65-7-4.1 (Rev.2005) (recognizing that roads may become county roads through "dedication, under the methods provided by statute, or by prescription and required by public convenience and necessity.").[3] The Attorney General's Office has opined that a road that has been platted and dedicated by the landowner for public use, but never accepted and maintained by the county, remains subject to acceptance by the county in the future pursuant to the dedication. Op. Att'y Gen. Parker (May 14, 2004).
¶ 35. The issues of whether Adams Lane was a public road and whether it and the utility easements have been abandoned are not determinative of whether COR could forego the statutory plat alteration procedures. Contrary to COR's argument, a road and utility easements appearing on a plat cannot dematerialize from the recorded plat upon a landowner's unilateral conclusion that these features have been abandoned. Rather, questions pertaining to the legal status of platted roads and, utility easements, such as whether these features have been abandoned and should be removed from the plat, are properly submitted to the chancery court pursuant to section 19-27-31 for determination on the merits. The purpose of the plat alteration statute is to channel these questions before the chancellor for determination after proper notice to all directly interested or adversely affected parties, which may include the county or municipality. See Breazeale, 422 So.2d at 271. It is only after these proceedings have occurred that the chancellor may alter the plat. Barrett, 483 So.2d at 306-07. Moreover, it is clear that considerations beyond the legal status of a platted feature should come into play in the chancellor's determination of whether to remove the feature from the plat under section 19-27-31. This is because the chancellor is to render the decision "according to the merits of the case" after all the interested parties have been given an opportunity to be heard. Miss.Code Ann. § 19-27-31; see Barrett, 483 So.2d at 305.
¶ 36. In conclusion, for this Court to determine that the plat has been altered through abandonment of the road and easements, when there has been no chancery court determination after proper notice under section 19-27-31, would be to permit COR to sidestep the procedure for plat alteration that has been prescribed by the Legislature. This we cannot do; *288 therefore, we affirm the decision of the chancery court. COR remains enjoined from proceeding with the development of Hickory Cove until such time as it has secured leave to do so after proper plat alteration proceedings pursuant to section 19-27-31 or section 17-1-23(4).
¶ 37. THE JUDGMENT OF THE CHANCERY COURT OF LAFAYETTE COUNTY IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. THE COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Adams Lane was not used as access to this house, which had separate private driveway access from College Hill Road.
[2] According to the minutes of the planning commission meeting, Sneed represented that the Hickory Cove development would have one hundred and fifty-seven parking spaces.
[3] The statutory proceeding for laying out or changing a county road is found at Mississippi Code Annotated section 65-7-57 (Rev. 2005).