# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00332-COA

| | |
|---|---|
| **RONNIE ROBERTSON AND DIANE ROBERTSON** | **APPELLANTS/CROSS-APPELLEES** |

**v.**

| | |
|---|---|
| **JEAN A. CATALANOTTO AND JODY M. CATALANOTTO** | **APPELLEES/CROSS-APPELLANTS** |

| | |
|---|---|
| DATE OF JUDGMENT: | 02/18/2014 |
| TRIAL JUDGE: | HON. DAWN H. BEAM |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | S. CHRISTOPHER FARRIS |
| ATTORNEYS FOR APPELLEES: | SAMUEL STEVEN MCHARD |
| | MARCUS ALAN MCLELLAND |
| | PAUL MANION ANDERSON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | ENTERED JUDGMENT FINDING RESTRICTIVE COVENANTS STILL IN EFFECT AND DENIED APPELLEES'/CROSS-APPELLANTS' REQUEST FOR DAMAGES |
| DISPOSITION: | AFFIRMED - 02/09/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND JAMES, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. Ronnie and Diane Robertson appeal the Forrest County Chancery Court's judgment finding their property subject to valid and enforceable restrictive covenants. Jody and Jean Catalanotto filed a cross-appeal of the chancellor's judgment, asserting that the chancellor erred in failing to award damages to the Catalanottos. Finding no error, we affirm the

chancellor's judgment.

**FACTS**

¶2.     The record reflects that South Pointe Investment Company owned 283.5 acres of

property in Forrest County, Mississippi, which it eventually sold into separate tracts of

undeveloped land.  South Pointe attached restrictive covenants to all of the property deeds,

and this action arises out of a dispute over the restrictive covenants.

¶3.     The restrictive covenants state, in pertinent part:

> The following Restrictive Covenants are hereby impressed upon the land, and said Restrictive Covenants shall run with the title to said property, or any part thereof, up to January 1, 1990, said Restrictive Covenants being as follows, to-wit:
>
> Said protective restrictions and conditions are imposed on the property for the purpose of insuring the use of this property for residential and improving the attractive features of the property and securing to the owner the full benefit and enjoyment of his home or cottage, with no greater restrictions upon the free and undisturbed use of his property, than is necessary to insure the same advantages to other owners. Any violation of the within restrictions may be prosecuted in law or in equity by any property owner of said area.
>
> (1) No portion of said property shall be used for other than residential or recreational purposes, and no soil or trees shall be removed for any commercial use.  Cutting of trees shall be limited to the extent necessary for clearing the foundation site for construction and improving the topography[;] any cutting of trees shall be done only under good forest management practices.
>
> (2) No building shall be erected on any individual tract other than one single family dwelling or cottage, with garage and a single utility building for stable, equipment, etc. . . . . Any house built on said tract shall have a minimum of One Thousand (1,000) square feet of total area . . . .
>
> . . . .
>
> (4) No structure of a temporary character, trailer, basement, tent, shack, garage

2

or other outbuilding shall be used on any tract at any time as a residence, wither [sic] temporarily or permanently. Any garage shall be constructed at the same time or subsequent to the construction of the house it is intended to serve.

. . . .

(14) *These restrictive covenants run with the land, but after January 1, 1990, may be changed by unanimous consent in writing of the owners.*

(Emphasis added).

¶4. The Catalanottos and Robertsons each purchased tracts of land formerly owned by South Pointe. The record reflects that the Catalanottos purchased their property in 1997. The Robertsons purchased their first tract of property in January 2011, and the Robertsons claim that when they purchased their property, it contained a lot of damaged timber from Hurricane Katrina. The Robertsons also state that when they bought the property, they were advised that the restrictive covenants had expired. The record reflects that the Robertsons' deed fails to mention any restrictive covenants.

¶5. Then, on April 25, 2011, the Robertsons began commercial logging operations on the property. The record reflects that the Robertsons submit that they hired a registered forester to advise them on the best forest-management practice in removing the damaged timber from their property and replanting the property. The record also shows that on that same day, counsel for the Catalanottos called the Robertsons to request that they comply with the restrictive covenants and immediately cease all logging operations on the land. However, the Robertsons continued the logging operations. As a result, the Catalanottos filed a petition for a preliminary injunction and temporary restraining order on April 25, 2011.

3

¶6.     The day after the filing of the petition, the chancellor held a hearing on the matter. The Robertsons received notice and participated in the hearing by telephone. During the hearing, Ronnie Robertson admitted that he began commercial logging operations on April 25, 2011. The chancellor entered a temporary restraining order prohibiting any further logging operations by the Robertsons. The chancellor eventually extended the temporary restraining order indefinitely pending a final trial on the merits.

¶7.     On May 12, 2011, the Catalanottos filed an amended petition for injunctive relief, to quiet title, for a declaratory judgment, for tortious breach of contract, for breach of contract, and for intentional infliction of emotional distress. The Catalanottos asserted that the Robertsons breached the contractual terms of the restrictive covenant, and as a result, the Catalanottos suffered the expense of lost time from work to enforce the covenants, plus court costs.

¶8.     On May 12, 2011, the Robertsons filed an answer to the petition for a preliminary injunction and temporary restraining order, arguing that the restrictive covenants expired on January 1, 1990, and were no longer in force and effect.[1] The Robertsons also filed a counter-complaint seeking a declaratory judgment that the restrictive covenants had expired and were no longer valid. The Robertsons requested that the court dismiss the Catalanottos' petition for a preliminary injunction and restraining order.

¶9.     Following a hearing on September 20, 2011, the chancellor entered an order setting forth that the parties had agreed to and entered into evidence a number of exhibits; that the

---

[1] On May 27, 2011, the Robertsons filed the answer to the Catalanottos' May 12, 2011 amended petition for injunctive relief and counter-complaint.

parties should file expert opinions; and that the chancellor would thereafter issue her opinion based upon the agreed exhibits, the expert opinions, briefing, and a site visit of the property. On December 13, 2011, the chancellor also ordered that all property owners affected by the restrictive covenants in question be joined as parties to the action.

¶10. On February 12, 2012, the Robertsons filed a motion to require removal of noncompliant structures and to increase the bond posted by the Catalanottos for the entry of the restraining order. The Robertsons alleged that the Catalanottos had "numerous noncompliant structures" on their property that failed to comply with the restrictive covenants.

¶11. On February 24, 2012, the Catalanottos filed a petition for a preliminary injunction against Ronnie Robertson requesting that the court enjoin and restrain him "from all activities which threaten[ed]" the Catalanottos.[2] The Catalanottos claimed that after filing their initial petition for an injunction, the Robertsons began verbally harassing and intimidating the Catalanottos and threatening to further destroy the security of their home. The Catalanottos specifically claim that on two separate occasions, Ronnie tore down the gate that the Catalanottos maintained at the entrance of the road, warning that if it were put back into place he would just "remove it again." The Catalanottos alleged that Ronnie also threatened to cut off the Catalanottos' road access entirely.

¶12. On June 27, 2012, the Catalanottos filed an amended motion for summary judgment

---

[2] On March 6, 2012, the Catalanottos filed an amended petition adding the other property owners affected by the restrictive covenants in question as defendants, and also added a cross-motion for summary judgment.

regarding the validity of the restrictive covenants. The record reflects that the chancellor heard testimony from the parties on July 17, 2012. On September 18, 2012, the parties entered an agreed stipulation, agreeing to a number of facts not in dispute; to the admission of exhibits and expert opinions; and that the issue of the existence, validity, and enforceability of the restrictive covenants was submitted to the chancellor based upon the agreed stipulation.

¶13. On October 5, 2012, the chancellor entered its order finding and adjudging that the restrictive covenants ran with the land and that based upon the "four-corners test," a full reading of the text showed that the restrictive covenants were "clear and unambiguous" and had not expired. The chancellor explained that although "all of the defendants (a vast majority of the property owners) testified that they no longer wanted the restrictive covenants to apply and only the [Catalanottos] wanted to continue to have the restrictive covenants in force," the subject restrictive covenants required unanimous consent, rather than majority rule, to be changed.

¶14. The chancellor also determined, after applying the factors set forth in *Vulcan Materials Co. v. Miller*, 691 So. 2d 908, 914 (Miss. 1997), that the restrictive covenants

> that are the subject of this litigation run with the land because (1) South Pointe Investment Company clearly intended to create such covenants; (2) there is privity of estate between [the Catalanottos] claiming the right to enforce the covenant and the defendants upon whom the burden of covenants is to be imposed; and (3) the covenants touch and concern the land in question.

As a result, the chancellor held that "it is immaterial that the restrictive covenants may not have been included in the conveyance to [the Robertsons]," since covenants that run with the

6

land are enforceable against a subsequent owner, even if the subsequent owner's deed fails to reference the covenant.

¶15.    After reviewing the expert opinions of registered foresters Shawn Clinton and Don Williams regarding good forest management, the chancellor also found that the restrictive covenants prohibited the removal of trees for commercial use.  The issue of damages was, per a stipulation, set to be determined at a later hearing.

¶16.    On April 26, 2013, the Catalanottos filed a motion for removal of a mobile home and a motion for citation of contempt of court against the Robertsons, alleging that the Robertsons moved a mobile home onto their property in March 2013, a "clear and contemptuous violation of the restrictive covenants" that the chancellor adjudged to be valid and enforceable.[3]

¶17.    A trial was held on January 16, 2014, on the issues of:  damages for the violation of restrictive covenants; whether a mobile home violates restrictive covenants; contempt for the removal of the gate; and attorney's fees.  The chancellor entered an order on February 21, 2014, denying the Catalanottos' request for damages, finding no violation of the restrictive covenants by the Robertson's logging operation.  The chancellor found, however, that the Robertsons' mobile home failed to comply with the square-footage requirements in the restrictive covenants.  The chancellor ordered that the Robertsons must either remove the mobile home or add additional square footage to bring it into compliance.  Regarding the issue of removing the gate, the chancellor stated that she "heard no proof" that Ronnie

_____

[3] An amended motion was filed on November 14, 2013.

removed the gate after the chancellor entered an order prohibiting Ronnie from doing so. Finally, the chancellor denied the Catalanottos' request for attorney's fees.

¶18. On March 7, 2014, the Robertsons appealed the chancellor's judgment denying their request for declaratory relief. On March 12, 2014, the Catalanottos filed a cross-appeal of the chancellor's judgment on the issues of: denial of damages for violation of restrictive covenants; tortious interference with contract; intentional infliction of emotional distress; failure to find contempt and damage for removal and tampering with the gate; failure to award punitive damages; failure to award damages for conversion of gates; failure to award attorney's fees for contempt by the Robertsons; failure to award pre-judgment interest; failure to award a permanent injunction preventing tampering with the entrance gate.

## STANDARD OF REVIEW

¶19. "The standard of review of a chancellor's decision is abuse of discretion." *Jones v. Graphia*, 95 So. 3d 751, 753 (¶6) (Miss. Ct. App. 2012). On appeal, we "will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong [or] clearly erroneous, or applied an erroneous legal standard." *Id*. Additionally, "this [C]ourt's review of a ruling regarding a restrictive covenant is limited to abuse of discretion." *Rawaid v. Murguia & Arias Grocery LLC*, 124 So. 3d 118, 121 (¶14) (Miss. Ct. App. 2013).

¶20. However, we apply a de novo standard when reviewing questions of law. *Jones*, 95 So. 3d at 753 (¶6).

## DISCUSSION

8

## I.      Restrictive Covenants

¶21.    The Robertsons argue that the chancellor erred in finding that the restrictive covenants at issue were valid and effective.  The Robertsons assert that the plain language of the restrictive covenants provides that the covenants expired on January 1, 1990.    The Robertsons also submit that no effort was ever made by the landowners prior to or after the expiration date of January 1, 1990, to extend or change the restrictive covenants.  The chancellor found that the restrictive covenants ran with the land and were enforceable against the Robertsons.

¶22.    In review of this case on appeal, we recognize the following:

> Generally, courts do not look with favor on restrictive covenants. Such covenants are subject more or less to a strict construction and, in the case of ambiguity, construction is usually most strongly against the person seeking the restriction and in favor of the person being restricted.

*Kephart v. Northbay Prop. Owners Ass'n*, 134 So. 3d 784, 786 (¶8) (Miss. Ct. App. 2013).

The supreme court also explained the following:

> Restrictive covenants should be fairly and reasonably construed, and the language used will be read in the ordinary sense. . . . The entire instrument should be considered in ascertaining its meaning, but the restrictions should not be extended by strained construction, especially when, as in this case, the restrictive covenants expressly permit the use being made of the land.

*Id*. (citing *Kinchen v. Layton*, 457 So. 2d 343, 346 (Miss. 1984)).  "Restrictive covenants are to be fairly and reasonably interpreted according to their apparent purpose." *Kephart*, 134 So. 3d at 786 (¶8).

¶23.    Restrictive covenants are subject to the rules of contract construction. *See Belager-Price v. Lingle*, 28 So. 3d 706, 711 (¶¶8-10) (Miss. Ct. App. 2010).  Regarding the

construction of contracts, the supreme court has set out a three-tiered approach to contract interpretation:

> First, the four corners test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. We must look to the four corners of the contract whenever possible to determine how to interpret it. When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. On the other hand, if the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties' apparent intent. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law.
>
> Secondly, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary canons of contract construction. Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party. Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiation, agreements and conversations might be considered in determining the parties' intentions in the construction of the contract.

*One S. Inc. v. Hollowell*, 963 So. 2d 1156, 1162-63 (¶10) (Miss. 2007) (internal quotation marks and citations omitted); *see also Facilities Inc. v. Rogers-Usry Chevrolet Inc*., 908 So. 2d 107, 110-11 (¶¶10-11) (Miss. 2005); *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc*., 857 So. 2d 748, 752-53 (¶¶10-11) (Miss. 2003). Keeping these rules in mind, we turn to address the merits of this issue.

¶24.    In applying the applicable law to the present case, we acknowledge that the restrictive covenants imposed upon the original deeds by South Pointe provided as follows:

10

> The following Restrictive Covenants are hereby impressed upon the land, and said Restrictive Covenants shall run with the title to said property, or any part thereof, up to January 1, 1990 . . . . These restrictive covenants run with the land, but after January 1, 1990, may be changed by unanimous consent in writing of the owners.

The record reflects that the chancellor acknowledged that when analyzing the construction of the restrictive covenant at issue, she "kept . . . in mind" that construction is more strongly construed against the person seeking the restriction. After looking "at the four corners" of the restrictive covenants, the chancellor found that "the full reading" of the restrictive covenants "is not ambiguous[,] and the intent is clear" that the covenants "may only be changed by all owners agreeing." The chancellor interpreted this language as providing that the restrictive covenants did not expire on January 1, 1990. The chancellor determined that the full reading of the restrictive covenants clearly established that January 1, 1990, constituted the date when the covenants could be changed by an agreement of all of the owners.

¶25. The chancellor also found that the restrictive covenants at issue ran with the land, stating that "it is immaterial that the restrictive covenants may not have been included in the conveyance to [the Robertsons]." In *Misita v. Conn*, 138 So. 3d 138, 141 (¶8) (Miss. 2014), supreme court explained that

> [a] covenant will run with the land if three conditions are met: (1) the covenanting parties must intend to create such covenant; (2) privity of estate must exist between the person claiming right to enforce the covenant and the person upon whom [the] burden of covenant is to be imposed; and (3) the covenant must touch and concern the land in question.

¶26. In the present case, the chancellor found the following: that South Pointe clearly

11

intended to create the restrictive covenants; that privity of estate existed between the Catalanottos and the Robertsons; and that the covenants touch and concern the land in question. We further acknowledge that "[a] covenant that runs with the land is not void merely because it is not referred to in any deed conveyed to subsequent owners." *Id*.

¶27. The Robertsons next argue that even if the chancellor correctly found that the covenants were valid and enforceable, the Robertsons still exercised "good forest management practices" in cutting timber. In support of their argument, the Robertsons cite to the following language in the covenants:

> No portion of said property shall be used for other than residential or recreational purposes, and no soil or trees shall be removed for any commercial use. Cutting of trees shall be limited to the extent necessary for clearing the foundation site for construction and improving the topography[;] any cutting of trees shall be done only under good forest management practices.

¶28. The Robertsons state that both they and the Catalanottos hired registered foresters to review the property and to provide an opinion as to whether or not the cutting of the timber would be in compliance with "good forest management practices." The Robertsons argue that the fact that the Catalanottos disagreed with the opinion of the Robertsons' forester and hired their own expert failed to change the fact that as long as the Robertsons complied with "good forest management practices," they can cut timber.

¶29. The chancellor herein found that the language "any cutting of trees shall be done only under good forest management practices" failed to refer to commercial logging, "but simply deal[t] with the ordinary care of this wooded property." The chancellor held that the language that "no . . . trees shall be removed for any commercial use" prohibited the

12

Robertsons from engaging in commercial logging.

¶30.    After our review, we find that the substantial and credible evidence in the record supports the chancellor's determination that the restrictive covenants herein are valid, enforceable, and run with the land.[4] We further find no error in the chancellor's ruling that the restrictive covenants prohibit the Robertsons from engaging in commercial logging.

## II.    Damages

¶31.    The Catalanottos argue on cross-appeal that the chancellor erred by failing to award damages on the following issues:  the Robertsons' willful violation of the restrictive covenants; intentional infliction of emotional distress; removing and tampering with the access gate to the Catalanottos' property; and conversion of the Catalanottos' gate.  The Catalanottos also claim that they were entitled to punitive damages and attorney's fees based on the Robertsons' willful and intentional breach of the restrictive covenants and court orders.  The Catalanottos assert that evidence showed the Robertsons stole the access gate to the Catalanottos' property and that the Robertsons threatened and harassed the Catalanottos to the point that they suffered fear, anxiety, and loss of sleep.

¶32.    As stated, we review the decision of a chancellor for abuse of discretion. *Jones*, 95 So. 3d at 753 (¶6).  We "will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong [or] clearly erroneous, or applied an erroneous legal standard." *Id*.

---

[4] *Rawaid*, 124 So. 3d at 121 (¶14) (standard for reviewing a ruling regarding a restrictive covenant is abuse of discretion).

¶33.    In her February 21, 2014 order, the chancellor denied the Catalanottos cross-appeal and declined to award actual damages, punitive damages, or attorney's fees to the Catalanottos.  Regarding the Catalanottos' claim that they were entitled to actual damages as a result of Ronnie's alleged violation of the restrictive covenants, the chancellor cited to *Levens v. Campbell*, 733 So. 2d 753, 760-61 (¶27) (Miss. 1999), and applied the elements for proving tortious interference with contractual relations.[5]  The record reflects that the chancellor herein held "[t]hese elements are just not present in this action and the court finds the act[s] of cutting the trees were not done with a purpose of causing damage and loss, without right or justifiable cause on the part of Robertson and that no actual damage or loss occurred."  The chancellor failed to find Robertson's conduct "malicious in any way," explaining as follows:

> [Ronnie] testified that he was told when he bought the property that the restrictive covenants no longer applied by the attorney who did the title work on the subject property.  When Robertson was served with the restraining order he stopped cutting trees.  Previously, Robertson testified that he bought the property as an investment to harvest the trees so the court ruling that the restrictive covenants still apply is an extreme financial setback for Robertson.

¶34.    In addressing the Catalanottos' claim for intentional infliction of emotional distress, the chancellor, citing *Summers ex rel. Dawson v. St. Andrew's Episcopal School Inc.*, 759 So.

---

[5] In *Levens*, 733 So. 2d at 760-61 (¶27), the supreme court stated:

The elements of tortious interference with a contract include:  1) the acts were intentional and willful; 2) that they were calculated to cause damages to the plaintiffs in their lawful business; 3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and 4) that actual loss occurred.

14

2d 1203, 1211 (¶34) (Miss. 2000), recognized that "[i]ntentional infliction of emotional distress can be predicated on behavior that is 'malicious, intentional, willful, wanton, grossly careless, indifferent or reckless.'" In denying the Catalanottos' request for damages, the chancellor provided the following:

> [T]he court cannot connect any of these complaints to violations of the restrictive covenants. In addition, there was no testimony of monetary damage due to emotional distress and therefore the court awards no money for this complaint. The court did not hear any evidence to support a judgment for punitive damages [against the Robertsons].

¶35. The decision of whether or not to grant an award of punitive damages lies within the chancellor's sound discretion. *Griffith v. Griffith*, 997 So. 2d 218, 223-24 (¶20) (Miss. Ct. App. 2008). "[T]he question of whether punitive damages should be awarded depends largely upon the particular circumstances of the case." *Id.* In the present case, the chancellor recognized that the standard of proof for punitive damages is clear and convincing evidence, and stated that "the plaintiff must show that the defendant acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud."[6] In denying the Catalanottos' request for an award of punitive damages, the chancellor explained that "[t]he court could not tie any conduct directly to [Ronnie] Robertson except removal of the first gate. There was no showing of actual malice, gross negligence which evidences a willful, wonton or reckless disregard for the safety of others or fraud." *See* Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2014).

¶36. After examining the restrictive covenants, the chancellor further found that the

---

[6] *See Summers*, 759 So. 2d at 1211 (¶34).

15

covenants "do not mention a gate to the common road that leads to the individual tracts of land." The chancellor acknowledged her prior March 14, 2012 order enjoining the Robertsons from removing or tampering with the gate at the entrance to the roadway easement from Rockhill Road, and explained that "this was an effort . . . to keep the peace during the pendency of this action." The chancellor, however, clarified that "the restrictive covenants do not address this gate and therefore the court does not order any of the parties not to remove or tamper with the gate." The chancellor declined to award damages based on the Catalanottos' claim that the Robertsons removed and tampered with the gate, stating "the Court heard no proof that it was [Ronnie] Robertson who removed the gate after the Order was entered. Mr. Robertson testified that a third party removed the gate and that he replaced the second gate with the first gate that he did remove prior to the Order being entered."

¶37. Finally, the chancellor declined to award attorney's fees as a result of the expenses incurred by the Catalanottos in enforcing the restrictive covenants. When reviewing a grant or denial of attorney's fees, "this Court will not disturb the trial court's award of attorney's fees unless there was an abuse of discretion." *Griffith*, 997 So. 2d at 224 (¶23). A trial court "may award attorney's fees, absent a contractual provision or statutory authority, where the trial court has found that punitive damages are appropriate." *Id.*; *see Aqua–Culture Techs. Ltd. v. Holly*, 677 So. 2d 171, 184 (Miss. 1996). The determination of an amount constituting a reasonable attorney's fee is within the sound discretion of the trial court." *Griffith,* 997 So. 2d at 224 (¶23).

¶38. In the present case, the chancellor explained that the restrictive covenants at issue

16

failed to address the issue of attorney's fees. Additionally, "there was a legitimate issue of whether or not the restrictive covenants were still in force and [e]ffect." Further, the chancellor stated that "the court is unaware of any statutory authority for awarding attorney['s] fees to the [Catalanottos]."

¶39. In *Hudson v. Morrison Heights Baptist Church*, 782 So. 2d 726, 732 (¶33) (Miss. 2001), the supreme court held that a chancellor did not abuse his discretion in failing to award attorney's fees where an injunction had not been violated by the defendants. Similarly, we find no abuse of discretion in the chancellor's denial of attorney's fees to the Catalanottos.

¶40. Our review of the record herein reveals no abuse of discretion by the chancellor in determining that the restrictive covenants are valid and enforceable and in denying the Catalanottos' request for damages. We further find that substantial evidence in the record supports the chancellor's findings and judgment.[7] Accordingly, we affirm.

¶41. **THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT IS AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANTS/CROSS-APPELLEES AND THE APPELLEES/CROSS-APPELLANTS.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, JAMES AND WILSON, JJ., CONCUR. LEE, C.J., AND GREENLEE, J., NOT PARTICIPATING.**

---

[7] *See Jones*, 95 So. 3d at 753 (¶6).

17