# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01407-COA

DIAMONDHEAD COUNTRY CLUB AND PROPERTY OWNERS ASSOCIATION INC., BOB MARTHOUSE, STEWART NUTTING, AND GARY BECKER

APPELLANTS

v.

COMMITTEE FOR CONTRACTUAL COVENANTS COMPLIANCE INC., JOSEPH FLOYD, AND PATRICK McCROSSEN

APPELLEES

DATE OF JUDGMENT: 08/07/2019
TRIAL JUDGE: HON. CARTER O. BISE
COURT FROM WHICH APPEALED: HANCOCK COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS: AUGUST NICHOLAS RECHTIEN
DAVID C. GOFF
ATTORNEYS FOR APPELLEES: MICHAEL D. HAAS JR.
CAROLINE ELIZABETH HAAS
NATURE OF THE CASE: CIVIL - CONTRACT
DISPOSITION: AFFIRMED - 06/09/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1. This is an appeal from a declaratory judgment entered by the Hancock County Chancery Court concerning the reasonableness of a provision in the developer's restrictive covenants that required an 85% consent of property owners to amend the covenants. The homeowners association, Diamondhead Country Club and Property Owners Association (DPOA) and its board members, Bob Marthouse, Stewart Nutting, and Gary Becker ("Appellants"), asked the chancery court to modify the provision so that only 60% of those

present and voting or voting by proxy would be required. The chancery court denied the Appellants' request. On appeal, the Appellants argue (1) that the provision was unreasonable; (2) that joinder of all property owners in the court proceeding was not necessary; and (3) that the Appellants were not estopped from challenging the reasonableness of the provision. Finding no abuse of discretion by the chancery court, we affirm.

**Facts**

¶2.     On June 17, 1970, Diamondhead Properties Inc. began the development of property it owned in Hancock County, Mississippi, into a residential, common-interest community. In the initial phase, Diamondhead established, through a "Declaration of Restrictions, Conditions, Easements, Covenants, Agreements, Liens and Charges," a set of use-and-maintenance restrictions for the "purpose of enhancing and protecting the value, desirability and attractiveness of said real property. . . ." These covenants specifically stated that they ran with the land and were binding on all purchasers.

¶3.     The declaration contained a number of directives concerning construction approvals, home sizes and specifications, parking rules, traffic regulation, and the payment by lot purchasers of assessments levied by the Diamondhead Yacht and Country Club Inc. and/or the Diamondhead Country Club and Property Owners Association Inc. With these assessments, the Association would maintain the common areas. In 1984, the DPOA was deeded these common areas and since then has owned and has maintained them.

¶4.     The covenants outlined in the declaration for Phase I extended for a period of fifty years "unless sooner annulled, amended or modified pursuant to the provisions of Article XXI

2

hereof." That article contains the procedure for amendments as follows:

> Any or all of the provisions of these restrictions, conditions, easements, covenants, liens and charges may be annulled, amended or modified at any time by the consent of the owner or owners of record of eighty-five percent (85%) of the lots in Diamondhead, Phase 1.

¶5.     From 1971 to 1973, during Phases 2 and 3 of the property development, Diamondhead imposed similar declarations of covenants with, for the most part, similar provisions for amendments and similar fifty-year terms.

¶6.     Purcell Inc. succeeded Diamondhead Properties Inc. and continued developing subdivisions and communities with condominiums and townhomes from the latter 1970s through the early 1990s. It also included covenants and restrictions, some containing no term for expiration but most containing the same 85% vote requirement for amendments.[1]  By the time of the litigation leading to this appeal, the entire development contained 6,949 properties and 4,759 housing units, consisting of single-family homes, townhomes, and condominiums. It was later stipulated that of the 43 phases of development, 37 include covenants that require 85% of the property owners to consent to any amendment.

¶7.     In 2012, the City of Diamondhead was incorporated and took over the maintenance of the streets, established zoning and other ordinances, and formed a police department.  The earlier developer covenants from 1970 through 1983 contained several zoning provisions that the DPOA and several members claimed were then in conflict with those of the City of

---

[1] The exceptions are the Glen Eagle subdivision development, which required 75% of the lot owners to agree to a change in the covenants; Pelican Cove, which required a two-thirds agreement, and Kona Villa, Lakeside Villa, Lanai Village and Molokai Condominiums, which required only a majority of the board of directors of the association and members to agree to a change.

Diamondhead. But no conflicting ordinances were introduced into evidence. According to the Appellants, other portions of the covenants are outdated and need revision. Moreover, homeowner participation in annual meetings of the DPOA since 2006 has approximated only 27% of the members, which is far below the 85% that is needed to amend the covenants. But, on the other hand, at no time did the DPOA ever attempt to amend the covenants or announce a meeting for such a purpose.

¶8. On June 17, 2016, the DPOA filed a "Petition for Declaratory Judgment" in the Hancock County Chancery Court. No property owners were joined as parties, and two years later, on October 26, 2018, the DPOA voluntarily dismissed the action.

¶9. On October 19, 2018, three DPOA board members (Bob Marthouse, Stewart Nutting, and Gary Becker) filed suit against the DPOA in the Hancock County Chancery Court. In the complaint, the board members outlined the facts above and the need for court intervention to declare that the 85% participation requirement in the amendment provision of the covenants was unreasonable. They further requested that the court set the voting requirement at 60% of those present and voting or voting by proxy. Admittedly, this was a "friendly" lawsuit because the DPOA answered, admitted all of the allegations, and joined in the prayer for relief. It was later learned that the DPOA had agreed to pay the plaintiffs' attorney's fees as well.

¶10. The DPOA sent a letter to all of its members on October 26, 2018, that included the following paragraph:

> The board and the administration have been working with the Diamondhead
> 2020 Committee to identify a procedure that allows us to modernize our

4

covenants and continue providing amenities that make Diamondhead a desired community. To provide our members with the best path towards having their voices heard, the board voted unanimously to move forward with a plan that makes it easier to update the POA's expiring covenants. This strategy lowers the 85% threshold for covenant amendment to 60% of the membership present or by proxy. The people who live, participate and vote in Diamondhead will decide what the future of the amenities looks like. This procedure ensures that each resident has a real voice in deciding the nature of our community in 2020 and beyond.

The letter failed to inform members that the "strategy" was the filing of a lawsuit. However, after the DPOA was served, it notified its members of the lawsuit by sending via mail, email, and website post, the following notice:

**The following serves as a notice of action taken by the Diamondhead Country Club and Property Owners Association, Inc. ("DPOA").**

The DPOA, acting by and through its board of directors, authorized the filing of a Complaint in the Chancery Court of Hancock County, Mississippi. The Complaint filed on October 19, 2018 is styled as Bob Marthouse, Stewart Nutting and Gary Becker v. Diamondhead County Club and Property Owners Association, Inc. A copy can be found on the Diamondhead POA web page. The Complaint explains the DPOA's situation with the various Covenants of the many phases in Diamondhead. The various Covenants in some cases will soon be 50 years old and are in dire need of updating. In some cases, the Covenants may conflict with City of Diamondhead regulations. These covenants will begin expiring within the next 18 months. Most importantly, the complaint explains that all these different sets of Covenants require the consent of 85% of the owners to update the Covenants. The Complaint goes on to explain that based upon the participation at the past annual (and other) meetings, it is impossible to meet the 85% participation requirement. With that said, the Complaint requests that the Court grant equitable relief to the DPOA and update the Covenants to the extent that they may be updated by a 60% majority of votes cast in person or by proxy. The Complaint also advises that all members of the DPOA will be put on notice of the filing via U.S. mail, email or information provided on the website, including the Complaint. The Complaint asks only to change the voting percentage needed to update the Covenants.

¶11. The City of Diamondhead, the Committee for Contractual Covenants Compliance Inc.

5

("CCCI") (a group formed by several Diamondhead property owners), and individual property owners Patrick McCrossen and Joseph Floyd sought and were granted intervention in the chancery court action. CCCI challenged the standing of the Plaintiffs and argued that the other 4,756 property owners were indispensable parties who were not joined, robbing the court of jurisdiction. It also pleaded that the plaintiff board members had failed to state a claim upon which relief could be granted.

¶12. After discovery, Marthouse, Nutting, and Becker filed a motion for a declaratory judgment claiming that unless the amendment provision was voided or changed, the covenants would start to expire, and the DPOA would no longer have the authority to enforce them. As a result, the DPOA, which was a perpetual non-profit corporation, would be unable to fulfill its purpose of preserving Diamondhead, and "the entire Diamondhead community itself [would be] as in jeopardy." CCCI and the individual intervenors McCrossen and Floyd opposed the motion. They acknowledged that the expiration of the covenants could result in a dramatic shift in the way the DPOA would manage and maintain its properties and amenities. But CCCI and the intervenors pointed out that because there was no ambiguity in the covenants requiring the court's interpretation, the provisions should be enforced as written. Moreover, because the covenants gave the DPOA its authority and funding, lowering the vote requirement could actually harm the DPOA if property owners sought to delete these provisions. Intervenors further argued that the DPOA existed at the time the covenants were written and that the clear, unambiguous language of the term provision anticipated that the obligations owed by property owners would cease in fifty years. How the DPOA would

6

survive thereafter was unclear, but it was clearly anticipated by the drafters of the covenants that funding through property-owners' fees would expire unless action was taken to extend the obligation. CCCI and the other intervenors also pointed out that the property owners were necessary parties who had not been joined in the actions. Finally, they argued that the chancery court had no authority under the law to change the voting requirement—at most it could only strike an allegedly unreasonable provision.

¶13. Intervenor City of Diamondhead took no position on the motion for a declaratory judgment.

¶14. On July 22, 2019, the chancery court heard arguments. The parties stipulated to the facts as stated above and that "the various declarations of covenants are clear and unambiguous." An attorney entered his special appearance on behalf of a property owner who had not been served or joined in the action. He argued that the matter should not go forward without his client and many other property owners whom were similarly not joined in this action and whom had not been given notice of the date, time, and place of the hearing.

¶15. At the close of argument, the court made a ruling from the bench. It calculated that a change to a vote requirement of 60% of those present at a meeting, which averaged 1,240 members, would mean that 744 property owners would be able to affect the rights of 4,759 members. Further, the terms of the covenant were not ambiguous, and the drafters clearly envisioned an end to the covenants in fifty years. The 85% figure did not shock the court's conscience. The court said even if it were wrong, the DPOA had enforced these covenants until 2016, and therefore, it was now estopped from claiming a need for a change. Finally,

7

the court found that property owners were entitled to notice of an action that would substantially affect their rights as property owners. They were not provided such notice.

¶16. This ruling was reduced to writing and added that the court found the amendment section to be a substantive provision of the covenants. The court also found that before it could re-write the provisions of the covenants, they must be found to be ambiguous, which the parties had stipulated they were not.

¶17. The court's judgment was filed on August 7, 2019. From that judgment, the DPOA, Marthouse, Nutting, and Becker appealed on September 6, 2019. They argue that the chancery court erred in (1) finding that the amendment provision was not unreasonable and failing to amend it; (2) finding that the DPOA was estopped from claiming that the amendment provision was unreasonable; and (3) finding that the DPOA had failed to give notice and join all DPOA members in this action. Because our resolution of the first issue is dispositive of this appeal, we will not address the other two.

**Standard of Review**

¶18. "[A]n appellate court employs a limited standard of review in chancery matters. The findings of the chancery court will not be disturbed when supported by substantial evidence unless the court abused its discretion, applied an erroneous legal standard, was manifestly wrong, or committed clear error." *Berlin v. Livingston Prop. Owners Ass'n Inc*., 232 So. 3d 148, 154 (¶16) (Miss. Ct. App. 2017) (citation and internal quotation marks omitted). A trial court's decision to grant or deny declaratory judgment relief is discretionary, but any of its conclusions of law are reviewed de novo. *Putney v. Sanford*, 282 So. 3d 627, 630 (¶9) (Miss.

8

Ct. App. 2019) (citing *Sledge v. Grenfell Sledge & Stevens PLLC*, 263 So. 3d 655, 661 (¶12) (Miss. 2018)).

**Discussion**

¶19.    "Restrictive covenants are subject to the rules of contract construction." *Robertson v. Catalanotto*, 205 So. 3d 666, 673 (¶23) (Miss. Ct. App. 2016).    When provisions are ambiguous, they are to be construed against the person seeking the restriction and in favor of the person being restricted.  *Id.* at (¶22) (quoting *Kephart v. Northbay Prop. Owners Ass'n*, 134 So. 3d 784, 786 (¶8) (Miss. Ct. App. 2013)).    But "when a contract is clear and unambiguous on its face, its construction is a matter of law, and not fact, and must be construed and enforced as written."  *Griffin v. Tall Timbers Dev. Inc.*, 681 So. 2d 546, 551 (Miss. 1996).    For example, in *Kephart,* the declaration of covenants allowed leasing of homes under certain conditions.  *Kephart*, 134 So. 2d at 785 (¶2).  The Declaration could only be amended by consent of 51% of the homeowners.  *Id.* at (¶4).  The homeowners association, which had the authority to make rules and regulations for the development, passed a resolution prohibiting leasing altogether and sought to enjoin the Kepharts when they leased their home. *Id.* at (¶¶3, 5).  The chancery court ordered the Kepharts to terminate the lease, and they appealed.  *Id.* at (¶5).  On appeal, we recognized and enforced the unambiguous language in the covenant that only allowed amendments to the covenant, such as the leasing condition, when properly consented to by 51% of the homeowners.  *Id.* at 786 (¶10).  Because no such vote had taken place, the provision in the covenant had to be enforced.

¶20.    We noted again in *Singh v. Cypress Lake Property Owners Ass'n*, 192 So. 3d 373, 377

9

(¶17) (Miss. Ct. App. 2016) (quoting *COR Devs. LLC v. Coll. Hill Heights Homeowners LLC*, 973 So. 2d 273, 280 (¶15) (Miss. Ct. App. 2008)), that "a restriction expressed in unambiguous language in a covenant will be enforced." In *Singh*, the chancery court held landowners in contempt of a permanent injunction concerning adjudicated violations of restrictive covenants attached to their property. *Id*. at 374 (¶1). The chancery court also assessed the owners with attorney's fees. *Id.* Among the issues on appeal was whether the chancery court erred in imposing the attorney's fees since the violations were not wilful. *Id.* We held that the fees were properly assessed, not because of the contempt finding, but because of the covenant's provision that allows the Association to collect fees if it must file an enforcement action. *Id.* at 377 (¶19).

¶21. Even restrictive covenants that are unambiguous must be reasonable in order to be enforceable. *Id*. at 377 (¶17). Any declaration establishing a covenant is subject to court review and the court "must be guided by the intent stated in the declaration of purpose and judged by a test of reasonableness." *Perry v. Bridgetown Cmty. Ass'n*, *Inc*., 486 So. 2d 1230, 1234 (Miss. 1986). "The test of reasonableness to be applied by this Court is the same as that which is to be applied by the chancery court, and the question of the validity of the clear and unambiguous covenant at issue is a matter of law." *Griffin*, 681 So. 2d at 555. The "reasonableness standard" requires that a court consider not only the rights of those challenging a provision, but also the rights of other association members who expect maintenance of the status quo in keeping with the overall plan and intent of the covenant. *Id.*

¶22. The Mississippi Supreme Court discussed the dilemma of interpreting covenants when

provisions are challenged in *Griffin v. Tall Timbers Development Inc.*, 681 So. 2d 546 (Miss.

1996).  It said:

> In construing covenants imposing restrictions and burdens on use of land, the language used will be read in its ordinary sense, and the restriction and burden will be construed in light of the circumstances surrounding its formulation, with the idea of carrying out its object, purpose and intent, and the restrictions and burdens should be fairly and reasonably interpreted according to their apparent purpose.

*Id.* at 554.

¶23.    In *Griffin*, the supreme court reviewed a chancellor's decision that among other things

modified a covenant provision that dealt with the amount of attorney's fees that an association

might recover in an enforcement action.  *Id*. at 553.  The chancellor levied a 25% attorney's

fee, but the covenants specifically stated that only a 15% fee was allowed.  *Id.*  The supreme

court noted a lack of precedent on the application of the "reasonableness" standard, and even

less on the authority of a court to re-write bylaws or covenants that it may find unreasonable.

*Id*.  The court went on to say:

> The judicial inquiry into the "reasonableness" of a covenant or bylaw enunciated in *Perry* does not provide the trial court with the authority to rewrite entire provisions the court may deem unreasonable, but rather allows the court to examine the reasonableness of the bylaw in light of the declaration of purpose.  "Review by the court must be guided by the intent stated in the declaration of purpose and judged by a test of reasonableness."  The chancery court may not substitute its own considered judgment for that of the homeowner's association nor may it determine that a 25% fee for collection was "more reasonable" than the 15% as stated in paragraph 11 of the covenants. We should only determine whether the bylaw as written is reasonable in light of the declaration of purpose.  If the bylaw is unreasonable, the court should strike it, and allow the homeowner's association an opportunity to promulgate a new bylaw through its own procedures.

*Id.* at 553-54 (citation omitted).  The supreme court noted the need to consider the rights of

11

other association members who expect enforcement of the provision as written. *Id*. at 554. It recognized the argument that an attorney's fee may need to be higher if an attorney must undertake foreclosure proceedings to enforce a covenant. *Id.* at 555. But the court found that the covenant itself contemplated this possibility at the time the 15% fee was established. *Id.* The supreme court reversed and rendered on the issue of attorney's fees, enforcing the 15% fee provision stated in the covenant. *Id*. at 556.

¶24.    In *Robertson v. Catalanotto*, 205 So. 3d 666, 669 (¶3) (Miss. Ct. App. 2016), we considered the following amendment provision to a restrictive covenant:

> These restrictive covenants run with the land, but after January 1, 1990, may be changed by unanimous consent in writing of the owners.

The covenant prohibited commercial logging on the property involved. *Id*. at 669 (¶2). In 2011, the Robertsons purchased the property which contained timber damaged by Hurricane Katrina. *Id*. at 669-70 (¶4). Believing the restrictive covenant had expired, the Robertsons consulted with a registered forester and began removing damaged trees and replanting. *Id*. at 670 (¶5). Neighboring property owners, the Catalanottos, informed the Robertsons of the restrictive covenant and eventually sued them in chancery court to enjoin further logging. *Id*. The chancery court held that the restrictive covenants had not expired and ran with the land. *Id*. at 671 (¶13). The chancellor explained that

> although "all of the defendants (a vast majority of the property owners) testified that they no longer wanted the restrictive covenants to apply and only the [Catalanottos] wanted to continue to have the restrictive covenants in force," the subject restrictive covenants required unanimous consent, rather than majority rule, to be changed.

The chancery court enforced the covenant, finding that it prohibited the removal of trees for

commercial use. *Id*. at (¶15). On appeal, we affirmed the chancery court's finding that unambiguous language of the covenant required unanimous consent of property owners to amend the covenant and the court's enforcement of the logging prohibition provision. *Id*. at 675 (¶30).

¶25. In the case at hand, the Appellants filed suit, asking the chancery court to find that its covenant's 85% consent amendment provision was unreasonable. They then wanted the court to modify the provision and lower the threshold needed to amend to 60% of those present at a meeting and voting or voting by proxy. The chancery court denied the relief requested, and we agree with the chancery court's decision.

¶26. The parties stipulated that the amendment provision was not ambiguous. According to the caselaw set forth above, when the covenant language is unambiguous, it is to be enforced as written. The board members contend, however, that the amendment requirement of an 85% vote is unreasonable and a chancery court has the authority to strike provisions it finds unreasonable.

¶27. The DPOA and its board members do not specify where and how the chancery court erred. They do not challenge the legal standard the chancery court used. They merely restate the arguments made to the chancery court in hopes that they can convince the appellate court that the provision is unreasonable and thereby find that the chancery court abused its discretion and was manifestly wrong.

¶28. The DPOA and its board members first contend that unless the court struck and revised the amendment provision, a cascade of catastrophic events would ensue: they would be unable

to amend the covenants to change their expiration date; if the covenants expire, then the Association may lose its ability to fulfill its purpose; if the Association cannot fulfill its purpose, then the Diamondhead community will be detrimentally affected. The fundamental flaw in this argument is that the covenants were not drafted to protect the rights of the Association, but to protect the rights of property owners. In *Griffin*, we noted that "while the interest of the association's attorney may be better served by increasing the fee provision, his interests are not part of the balancing inherent in the reasonableness inquiry in *Perry*, 486 So. 2d at 1234." *Griffin*, 681 So. 2d at 554. So too in this case, the interests of the DPOA, a separately incorporated entity, are not those to be considered when considering the reasonableness of the amendment provision.

¶29. Further, the DPOA and its board members put nothing in the record to support their claims that the Diamondhead community would be detrimentally affected. They claim that there are some conflicts between the zoning provisions of the covenants and the city zoning ordinances, but they provided no concrete example of such a conflict. During oral argument to the chancery court, they argued that when the covenants expire, there would be no funds to maintain the common areas. But they conceded that the city could become responsible for them. Any detrimental effect on the Diamondhead community was purely speculative.

¶30. The chancery court found the amendment provision constituted a substantive, not merely procedural, right of all members, and we agree. As noted in the argument before the chancery court, a property owner could rely on the 85% consent-to-amend provision as insurance that the covenants would not be changed "willy-nilly" or by a few. The court noted

that a modification reducing the number of votes necessary would undermine that assurance. It calculated that changing the required number to 60% would result in 744 members being able to amend any provision of the covenants and affect the rights of 4,759 members.

¶31.    Although the drafters of the covenants envisioned the formation of the DPOA and included provisions in the covenants concerning its authority, the DPOA's existence does not depend on the covenants.  Since the inception of the development, the DPOA has been separately incorporated and has actually been deeded the common areas.  Because the covenants run with the land, under *Robertson v. Catalanotto*, the DPOA's operation should not be affected by the expiration of the covenant's term.

¶32.    The developer clearly established the 85% amendment provision in 1970. For forty-six years, this provision was unchallenged and thus was apparently deemed reasonable by the DPOA, its board, and its members until 2016.  That the DPOA has never asked its members to consider the matter undermines its argument that low attendance at prior meetings requires court intervention.  Perhaps attendance would be higher if a meeting were called for the purpose of changing the amendment provision.  As the intervenors pointed out, nothing prohibits the DPOA from calling such a meeting.[2]

¶33.    Considering the facts and the law, we find no abuse of discretion, errors of law, or findings that were manifestly wrong by the chancery court in reaching its decision that the

---

[2] The DPOA contends that we should not consider the appellee's brief because, they say, the Appellees did not cite case authority.  But the Appellees did cite relevant authority in their summary-of-the-argument portion. Both sides presented authority, albeit in different sections of the briefs, and proceeded with factual arguments.  Accordingly, we considered the arguments presented by both.

85% amendment requirement was not unreasonable. This finding obviates the need for us to discuss the other issues raised on appeal, and we affirm the judgment of the chancery court.

## Conclusion

¶34. Because it did not err in finding that the provision to amend the Diamondhead Declaration of Covenants was not unreasonable, we hereby affirm the judgment of the chancery court in this matter.

¶35. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**